## Burt & Brabb Lumber Co. v. Sackett, et al.

(Decided February 29, 1912.)

### Appeal from Leslie Circuit Court.

1. Land—Adverse Possession.—Where A. conveyed to B. a large body of land to only a part of which he had title, the settlement of B. within the land to which A. had title did not give him the right to hold by adverse possession any of the land to which A. had no title. The only way by which B. could claim by adverse possession the land to which A. had no title was by taking actual adverse possession of this land within the boundary of the deed and without the land to which A. had title, and holding the same for the required length of time.

2. Same—Adverse Possession.—But where a claimant enters upon land under a deed describing a boundary and takes actual possession, his claim will extend to the boundary of his deed, provided his grantor had no title to any part of the land.

3. Same—Rights of Junior Patentee Within a Boundary Covered by Prior Deed to Which Grantor in Deed Had No Title.—Where A. conveyed to B. land, to a part of which A. had title and to a part of which he did not, and B. did not make any settlement of enclosure within his deed, outside of the land to which he had good title until after the land embraced by the deed to which he had no title had been patented by C., he could not claim or hold by adverse possession the land patented by C. without an actual entry thereon. But if he made such entry and maintained it for 15 years, his claim would defeat the title and constructive possession of C.

4. Same—Adverse Possession—What is Well Defined Boundary.—The boundary to which the claim of adverse possession will extend must be well defined or well marked in such a manner as to give the true owner of the land notice that it was a marked boundary and that some person was claiming to be in the hostile possession of the land to this boundary. The occasional marking of a tree here and there, or the assertion of a claim to a boundary decribed by natural objects, such as mountains or rocks, is not such a boundary as will put a claimant without a deed in possession to the boundary. But when a person claiming by adverse possession has a deed of record, and this deed so describes the boundary by natural or artificial objects as that it can be run by a surveyor, and he makes an actual settlement or enclosure within the boundary, this will carry his possession to the extent of the boundary described in the deed, although the boundary described in the deed might be insufficient to constitute a well marked boundary if there was no deed.

5. Same—Adverse Possession—Separate Disconnected Tracts of Land.—If A. owns two or more tracts of disconnected land, the actual entry and adverse possession by another upon one of these

tracts, although the entry be under a deed that includes all of them in its boundaries, will not extend his actual possession to any of the others. If the intruder desires to hold all of them by adverse possession, he must do such acts as to each as will constitute adverse possession as to each particular tract, as each disconnected tract is to be treated as a separate disconnected boundary.

H. C. FAULKNER,. JESSE. MORGAN and METCALF & JEF-FRIES for appellant.

CLEON K. CALVERT for appellees.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

The appellant, Burt & Brabb Lumber Company, brought this suit in ejectment against the appellee, Sackett, in 1909, asserting that it was the owner and entitled to the possession of two separate disconnected tracts of land, each containing 100 acres, that were wrongfully withheld from it by Sackett. The Burt & Brabb Lumber Company showed a good paper title to each of them, tracing back to two patents issued to G..M. Asher in 1888, the patents being for 100 acres each and numbered respectively 61,941, 61,942, but there was never any actual possession of these lands by Asher or his vendees.

The answer, after controverting the petition, set up that Sackett was the owner of a large body of land, describing it, the exterior boundaries of which embraced the two tracts of land described in the petition, and that he and his vendors had been in the actual, adverse, notorious, continuous and uninterrupted possession of the boundary described in his answer for a period of more than fifteen years before the institution of this action.

Upon a trial before a jury, there was a verdict in favor of Sackett, the effect of which was to give him posession of the two tracts in dispute. From the judgment entered in conformity to this verdict, the Burt & Brabb Lumber Company prosecutes this appeal.

It appears from the record and map filed therewith that there lies between the land embraced in the two Asher patents a body of land containing 150 acres, for which a patent issued to H. M. Lewis in 1867, and that in 1875 H. M. Lewis conveyed to John Shell a boundary of land "supposed to contain 1,000 acres," which included the 150 acres covered by the Lewis patent, and also em-

braced the land for which Asher obtained patents. There was included in the boundary of this deed other patented land, as well as a large quantity of vacant land to which Lewis had no title, claim or right. For a part of this vacant land Asher afterwards obtained the two patents in controversy. But it does not seem necessary in disposing of this case to notice any of the patents included in the boundary of this deed when it was made, except the Lewis patent for 150 acres. In April, 1887, John Shell conveyed to J. M. Shell a boundary of land that embraced within its lines the 150-acre Lewis patent, as well as the land covered by the Asher patents, and in July, 1890, J. M. Shell conveyed to A. B. Shell a body of land that also embraced within its lines the Lewis patent and the land covered by the Asher patents. In September, 1890, A. B. Shell conveyed a boundary to S. B. Shell, that also embraced within its exterior lines the land patented by Lewis as well as the land that had been patented by Asher in 1888. In 1906 S. B. Shell conveyed to Sackett 567 acres. This last-mentioned deed describes the land by metes and bounds, courses and distances, and includes within its lines the Lewis patent as well as the two tracts for which Asher obtained patents.

It will thus be seen that the land conveyed by Lewis and to which he had no title or other claim that covered the Asher patents, came by regular conveyances into the possession of Sackett in 1906. There is evidence that when John Shell purchased from Lewis in 1875, he settled within the lines of the 150-acre Lewis patent, and built there a house, and that in 1887 J. M. Shell, the vendee of John Shell, settled within the lines of the Lewis patent, and that in 1888 A. B. Shell moved upon the land that was conveyed to him by J. M. Shell in 1890, and built a house within the lines of the H. M. Lewis patent. There is also evidence that this place has always been the home of the Shells, and immediately around it they have always had a little land in cultivation. There is also evidence that John Shell claimed to the extent of the boundary conveyed to him by Lewis, and that J. M., A. B. and S. B. Shell claimed respectively to the boundaries contained in the deeds conveying the land to them. Under this state of facts, it is the contention of Sackett that as his vendors, the Shells, actually resided continuously for more than fifteen years before the institution of this action within the boundary conveyed to him,

claiming to own the land to the extent of their respective deeded boundaries which were well marked, that this is such an adverse possession as will defeat the paper title and constructive possession of the Burt & Brabb Lumber Company under the Asher patents. On the other hand, it is maintained by counsel for the Burt & Brabb Lumber Company that Sackett can not hold under the claim of adverse possession any of the land outside of the 150-acre Lewis patent, to which he has undoubted title except an inclosure of about twenty acres in patent No. 61,941. It is conceded that neither Sackett nor any of the Shells ever entered upon or exercised any acts of physical ownership over the land covered by the Asher patent No. 61,942, and which lies north of and adjoining the Lewis patent. This land was never cultivated, settled upon or occupied in any way by any person. But there is evidence that a part of the land covered by the Asher patent No. 61,941 and which lies south of and adjoins the Lewis 150 acre patent was cleared, enclosed and cultivated by the Shells in 1887, more than fifteen years before the institution of the action, and that this cultivation and enclosure continued without interruption until 1906 or 1907.

Leaving out of view for the present the cultivation and enclosure within the lines of the Asher patent No. 61,941, the first question arising on the record is, did the conveyance by Lewis to John Shell in 1875, and his settlement upon the land covered by the 150 acre patent of Lewis, place him in the adverse possession to the extent of the entire boundary conveyed to him by Lewis, although he may not have had any actual possession of the land outside of the 150 acres, and, did the subsequent conveyances continue the Shells in the adverse possession of the land to the extent of the boundary conveyed to each of them, although they may not have taken actual physical possession of any of the land outside of the 150-acre patent? If it did, then Sackett has made out a possessory title that will defeat the title and possession of the Burt & Brabb Lumber Company to both of the Asher patents.

In considering this case, it should be kept well in mind that when John Shell purchased from Lewis, he settled within the lines of the H. M. Lewis patent, and within the lines of this patent have always resided his vendees down to Sackett, and that the lines of this patent do not interfer with the Asher patents. But title is

asserted to this Asher land by virtue of the deeds made, beginning with Lewis, and which embrace not only the lands patented by Lewis, but the surrounding lands, including the Asher patents, and it is insisted that as the Shells respectively settled within the lines of these deeds, their possession extended to the exterior boundaries of the deeds, which they say are well marked. In support of this proposition counsel relies upon several cases, among them, Fox v. Hinton, 4 Bibb, 559, in which the court said:

"There is no doubt that according to the settled doctrine of the common law a person might by entering upon a part of a tract or parcel of land in the name of the whole, gain possession of the whole, where the possession was at the time of making such entry vacant. * * * Where the entry is made upon that part to which he had no right of entry, the act is in itself wrongful and can not be made right by construction. In such a case, therefore, we can perceive no reason for limiting his possession to his close or fence, especially in this country where the close or fence is not the usual boundary which separates different tracts or parcels of land from each other."

And Thomas v. Harrow, 4 Bibb., 563. In this case, which was an action in ejectment—

"It appeared that the Harrows or those under whom they hold, had more than twenty years before the suit was brought by Thomas, entered upon their respective tracts or parcels of land, and cleared and enclosed parts thereof, claiming title thereto under deeds of conveyance previously made to them according to specified boundaries. But, although the person who made the conveyances claimed the land under an entry, it did not appear that the entry covered the land, nor did it appear that there had been any survey made or patent issued prior to the entry until within less than twenty years prior to the bringing of the action. On this state of facts, the question was made in the court below, whether the possession of the defendants should be co-extensive with the boundaries of their respective deeds or be confined to their close or fences. That court decided that their possession was co-extensive with the boundary of their deeds. * * * We have no hesitation in saying that the court decided correctly. The case of Fox v. Hinton, is we apprehend conclusive upon this point. It was held in that case that where there are two patents,

interfering with each other, while the possession remains vacant, an entry is made on the land within the interference by one claiming title under the junior patent, his possession shall not be limited to his close, but be construed to be co-extensive with the interference. And in principle we can perceive no difference in this respect between the case of a possession acquired under a junior patent, and a possession obtained under a deed with definite boundaries which was made by one having no title. In either case the tract or parcel of land, the possession of which is intended to be taken is equally certain, and the junior patent could not, no more than such a deed, confer title.   *   *   *   If even color of title was necessary, as was supposed in argument, on the part of Thomas, we could not doubt that the deed would be as efficacious as the patent for that purpose.''

And Taylor & Crate v. Burt & Brabb Lumber Co., 109 S. W., 348, where it is said:

''The rule of law in this State is well settled that a claimant entering upon land under a deed describing a boundary intending to take possession of the entire tract, no part of which is at the time of his entry actually possessed by any other claimant holding adversely to him, is by construction and intendment of law in the actual possession of all the land included within the boundary of his deed.''

But the facts of this case do not bring it within the principle announced in these cases and many others following them; because here the Shells entered and settled upon the Lewis patent, to which they had undoubted title. The principle announced in these cases only applies when the entry is altogether wrongful, and upon land to no part of which the entrant has title. To illustrate, if A. enters and settles upon a tract of vacant and unoccupied land, under a deed from B., who had no title to any part of it his possession will be deemed to be co-extensive with the boundary of his deed; but, if A. enters and settles upon land to which he has a good title, and simultaneously or thereafter obtains a deed to adjoining land from a person who had no title thereto, his possession will not extend to the boundaries of the deed or outside of the boundary to which he had title, unless he settles on or takes actual possession without the boundary to which he has title, and within the lines of the land conveyed to him by the deed. This is the law as declared in

Trimble v. Smith, 4 Bibb., 257, and recognized in Fox v.
Hinton, supra, where the court said:

"If indeed the person making such an entry had a
right of entry as to a part of the land and not as to the
residue, his entry upon that part to which he had the
right would not be construed to give him possession of
that part to which he had no right, as was decided in the
case of Trimble v. Smith. For that would be making an
act which was in itself right, wrongful by construction."

And this rule we have consistently followed—the
latest case upon the subject being Whitley County Land
Co. v. Powers, 146 Ky., 801. Having this view of the
matter, it follows that the deeds under which Sackett
claims do not in or of themselves give him title or posses-
sion of any of the land outside of the Lewis patent. The
deeds under which he claims are only useful in so far as
they describe boundaries. The only way in which Sack-
ett can defeat, if at all, the title and constructive posses-
sion of the Burt & Brabb Lumber Company to the land
covered by the Asher patents is by showing such actual
adverse possession by the Shells prior to 1888 of some
part of the vacant land outside of the Lewis patent and
within the lines of their deeds as would give them pos-
session to the lines of their deeds. As we have noticed,
there is evidence that beginning in 1887 and continuously
for more than fifteen years before the institution of this
action, the vendors of Sackett had enclosed and in culti-
vation certain parts of the land embraced by patent No.
61,941, and that they cut considerable timber from the
land covered by it, although there was never any house
built on this land or other occupancy of it except by
clearing, inclosure, cultivation and cutting timber. In
short, A. B. and S. B. Shell, who lived within the lines
of the 150-acre Lewis patent, but close to this Asher
patent No. 61,941, used a part of the land embraced in
patent No. 61,941 in connection with the land about the
house in which they lived. Upon this state of facts, it
is insisted by the Burt & Brabb Lumber Company that
Sackett should be confined to so much of the land within
this patent as the evidence shows was enclosed or in
cultivation for fifteen years or more before the institu-
tion of this suit. On the other hand, it is the claim of
Sackett that the enclosure and cultivation for the time
mentioned placed the Shells and consequently himself,
in possession of the whole of the tract of land outside of
the Lewis patent that was claimed by the Shells to a

well marked boundary. If this contention can be maintained, and the enclosure and cultivation of a small area outside of the Lewis patent continuously since 1887 had the effect of putting and keeping the Shells in actual possession of the whole boundary included in their deeds, then Sackett would be entitled to the land covered by both the Asher patents, if there was sufficient evidence to show that the actual possession by the Shells outside of the Lewis patent and within the lines of their deeds was commenced before the patents to Asher were issued. The question then is, was the boundary to which the Shells claim, a well marked and well defined boundary. Looking to the deed made by Lewis to John Shell, and the subsequent deeds made, excepting the deed from S. B. Shell to Sackett, we find that none of them describe the land by metes and bounds, or courses and distances. To illustrate, the deed from Lewis to John Shell, for the tract of land supposed to contain 1,000 acres, described it as beginning "at the mouth of Wild Cat Hollow on the south bank of the Grassy fork of the Kentucky river;" one call is "to a mulberry, buckeye and beech near the big rock ford;" another is "to the top of the mountain;" another "to the top of the mountain opposite Lovely;" another "to the top of the ridge at the head of the Gray branch." The boundary in the deed from John Shell to J. M. Shell is very much like the boundary in the deed from Lewis to John Shell. To illustrate, it begins at "the upper end of the Camp falls on a spruce pine, thence up the ridge in a straight line to the top of the mountain;" "thence with the ridge to the head of Fed's branch;" "thence with the conditional line between John Shell and William Shell;" "thence with the ridge to the Slick Rock hollow." The deed from J. M. Shell to A'. B. Shell described the land in the same manner as the other two deeds, viz.: It recites that the land begins at "two spruce pines at the upper end of Cove field; thence in a straight line to the top of the mountain;" thence with the meanders of the hills to "Templeton's gap;" thence "to a chestnut;" thence with the meanders of the hills to "Slick Rock Hollow." The boundary in the deed from A. B. Shell to S. B. Shell begins at "two spruce pines at the ford of said Laurel and upper end of the cane field;" thence easterly in a straight line "to the top of the ridge between Laurel and Greasy;" thence "up said hollow to the top of the mountain;" thence "to the head to Slick Rock Hollow;" thence "down said hollow to the

Laurel fork." Only a few of these lines are marked by courses and distances—the majority of them simply running from one natural object to another, without giving either course or distance. The evidence shows that here and there on the lines of these deeds would be found a marked tree, but there were no marked lines that any person could well follow, although a surveyor could take the deeds and run the lines with reasonable certainty.

If the Shells claimed to the boundary described in their deeds, without having any deeds, we would say that neither the natural objects nor the marked trees or both constituted such a well defined or well marked boundary as is contemplated by the law of adverse possession. When a person settles within a large body of wild, uncultivated, unenclosed vacant land, and builds a house or makes a clearing or an enclosure, he is only in the possession of so much of the land as he has enclosed or put in cultivation, unless he has also described by well defined or well marked boundaries a larger body of land embracing his settlement or enclosure. And if he has done this, his settlement or enclosure will carry his possession to the extent of his well defined or well marked boundary. But the boundary to which he claims should be defined or marked in such a way as to give the true owner of the land whether it be the State or an individual notice that it was a marked boundary, and that some person was claiming to be in the hostile possession of the land to this boundary. The occasional marking of a tree here and there, or the assertion of a claim to a boundary that begins, for example, "at the top of a mountain" and runs "to the top of a ridge," and thence "to a big flat rock" and thence "to a poplar tree on a creek" is not such a boundary as will put the claimant without a deed in possession of the land to the boundary or outside of his settlement or enclosure. But when the person claiming by adverse possession has a deed of record, and this deed describes as do the Shell deeds the boundary by natural or artificial objects so that it can be run by a surveyor and he makes an actual settlement, or enclosure within the boundary, this will carry his possession to the extent of the boundary described in the deed, although the boundary described in the deed might be wholly insufficient to constitute a well marked boundary, if there was no deed. The reason for this is that the deed on record gives notice of the extent

and lines of the possession, and if the owner or any person desires to know how much the settler claims outside of his clearing, it can be ascertained by an inspection of the deed and by running its lines. Under the facts we have stated, and the conclusion we have reached, there were two questions of law that should have been submitted to the jury in appropriate instructions, and these related—first, to whether the acts of possession b⁓ enclosure and clearing exercised by the Shells extended beyond the lines of the H. M. Lewis 150-acre patent, and second, if they did, when these acts of possession were commenced. If the Shells, prior to the issual of the Asher patents, made an entry on vacant land outside of the Lewis patent, and within the boundary of their deeds, by enclosure and cultivation, and continued this for a period of fifteen years or more, then Sackett was entitled under the evidence in the record to the land conveyed to him by S. B. Shell. On the other hand if the clearing and enclosure by the Shells was not extended beyond the lines of the H. M. Lewis 150-acre patent, Sackett was not entitled to hold by adverse possession any of the land to which Asher obtained patents. But if after Asher obtained his patents the Shells made an actual entry by clearing an enclosure within the lines of both the Asher patents, and maintained this enclosure and clearing continuously for a period of fifteen years or more, then Sackett was entitled to hold this land by adverse possession. And if they made such entry upon the land covered by either one of the Asher patents, and maintained it continuously for fifteen years or more, then Sackett would be entitled to hold by adverse possession the land covered by the patent in which such entry was made. But, an entry and possession within the lines of one of the Asher patents would not carry the entry and possession to the other. Or, to state it differently, if A owns two or more tracts of disconnected land, the actual entry and adverse possession by another upon one of these tracts, although the entry be under a deed that includes all of them in its boundaries, will not extend his actual possession to any of the others. If the intruder desires to hold all of them by adverse possession, then he must do such acts as to each as will constitute adverse possession of each particular tract, as each disconnected tract is to be treated as a separate distinct boundary.

The lower court instructed the jury in substance that

if they believed from the evidence that Sackett and those under whom he claimed entered upon a boundary of land which included the other patents under a deed in 1890, and that Sackett and those under whom he claimed from and after that date held the continuous, actual, adverse possession of such boundary of land, claiming and holding same to a well-marked or plainly defined boundary, for as much as fifteen years continuously, they should find for Sackett.

The court evidently gave these instructions upon the theory that the deeds under which the Shells claimed, in connection with their settlement within the boundary of the deeds, whether the settlement was within or without the H. M. Lewis patent, put them in possession to the boundaries in their deeds. But this in our opinion was an erroneous view of the law of the case. The jury should have been told in substance that (a) if the settlement, or enclosure, and clearing of the Shells was never extended beyond the lines of the H. M. Lewis patent, then they should find for the Burt & Brabb Lumber Company. (b) But if they believed from the evidence that prior to the issual of the Asher patents the Shells by settlement, clearing or enclosure continuously maintained for a period of fifteen years or more, entered upon and took possession of vacant land outside of the H. M. Lewis 150-acre patent, which included the land patented by Asher, then they should find for Sackett. (c) Or, if they believed that after the Asher patents were issued, the Shells made an entry and enclosure upon the land covered by the Asher patent No. 61,941, and maintained this entry and enclosure continuously for a period of fifteen years or more, they should find for Sackett as to the land covered by Asher patent No. 61,941.

Wherefore, the judgment is reversed with directions for a new trial in conformity with this opinion.