MOSLEY et al. v. KENTUCKY COAL LANDS CO.

(Circuit Court of Appeals, Sixth Circuit. December 19, 1918.)

No. 3154.

1. ADVERSE POSSESSION ⊂⊃100(4)—GROUNDS OF PRESCRIPTION—LAND CLAIMEI UNDER DIFFERENT RIGHTS.
    It is the settled rule in Kentucky that, when the alleged disseisor with color has good title to part of his described tract, and none to the remainder, such actual possession as he takes within the limits of his good title will be referred to that title only, and that outside of such limits he can prevail against an adverse title only by depending upon actual possession within the interference or overlap between such adverse title and that part of his own entire claim which is only color, and not title.
2. ADVERSE POSSESSION ⊂⊃100(2)—EXTENT OF POSSESSION—UNRECORDED DEED.
    In Kentucky, where land granted or conveyed is described by irregular boundaries, and not by government subdivisions, the recording of a deed giving color of title is not essential to the extending of the grantee's actual possession constructively to the boundaries named therein.
3. ADVERSE POSSESSION ⊂⊃100(4)—EXTENT OF POSSESSION—DESCRIPTION IN DEED.
    Boundary of a tract of land as described in the deed *held* sufficiently well defined, under the Kentucky rule, to make a basis for constructive adverse possession of the whole tract by the grantee beyond his actual occupation.
4. ADVERSE POSSESSION ⊂⊃21—ACTUAL POSSESSION—ACTS OF OWNERSHIP.
    Continuous cultivation of land every other year for the statutory period, while in alternate years it is used for pasture, but remains inclosed, is sufficient to meet the requirements of adverse possession.

Appeal from the District Court of the United States for the Eastern District of Kentucky.

Suit in equity by Elihu Mosley and another against the Kentucky Coal Lands Company. Decree for defendant, and complainants appeal. Reversed.

This is a bill to remove a cloud from title to real estate, and it presents problems concerning the character, extent, and effect of possession of lands in Kentucky. The title of Mosley, plaintiff below, was based wholly upon adverse possession; the District Court thought it not sufficiently made out, and dismissed the bill, and Mosley appeals.

The Kentucky statutory period of adverse possession necessary to make title is 15 years. This suit was commenced in 1911. In February, 1882, Lucy Roberts made a deed to Henry Mosley. She had no title or color of title to the described premises (except as to certain parcels thereof). Henry Mosley moved upon the premises, built a house, and occupied them until his death in December, 1883. He left a wife and several sons and daughters, who continued the same occupation. Elihu Mosley, a son, purchased the interests of his coheirs (excepting that of one sister, who joined with him as plaintiff), continued the occupation, and brought this suit.

The defendant claims under two patents, one of which was issued to William Mattingly, for 100 acres, in 1846, and overlaps and includes the northwesterly part of the tract said to be described by the Roberts-Mosley deed, and the other of which was issued to William Sizemore, for 50 acres, in 1885, and overlaps the southwesterly part of the deeded tract. The questions involved can be better understood by reference to the sketch map here reproduced, showing approximately the relative location of the chief natural objects and

MATTINGLEY PATENT ——
PACE PATENT —·—·—·
SIZEMORE PATENT ------

lines involved. Muncey's creek, flowing north and then east, enters the Middle fork of the Kentucky river. About half a mile up the creek, we find a high ridge at right angles to the creek, and which, with a break where the creek comes through, continues east until it joins the ridge between the creek and the river. Going up the creek from the mouth, and before reaching this ridge, there are two branches on the right and one small one on the left. The ridges which mark the watershed of all these branches, taken in connection with the cross-over ridge just mentioned and the ridge between the river and the creek, make a fairly continuous line of ridges in the approximate form of a horseshoe, closed at the mouth by the river and including about 400 acres;

and this is the boundary now claimed by Mosley to be that described in the Roberts deed. The heavy black line indicates the summit of the ridges just recited. True, these natural objects do not form so obvious an inclosure as might be thought if the description went no further, because it includes other ridges among the two branches, because the cross-over ridge is not continuous, but is broken into fan-shaped spurs on both sides of the creek, and because the line F G departs from the main ridge. For 50 years before Mosley took his conveyance, Lucy Roberts' father, Bowlin, and she and her first husband, Godsey, and she and her second husband, Roberts, had lived upon the bottom lands along the creek or the mouth of these branches, with houses in three different locations, and with a considerable acreage of lands under fence and under cultivation. Henry Mosley and his children continued and extended this occupation, and, for more than 15 years before the suit commenced, had actually occupied, with buildings or cultivation, probably 50 acres. For the whole 80 years before suit commenced, no one other than the Bowlin, Roberts, and Mosley families had ever lived within this external boundary or had any actual possession of any part thereof, excepting that Thomas North, a predecessor of defendant, under the Mattingly grant, had lived thereon for a few years prior to 1864, at which date he permanently moved away, and excepting—if they be exceptions—running of lines and cutting of timber.

The greater part of the actual occupation by the Mosleys and their predecessors was within the lines of a patent to Robert Pace, about simultaneous with that to Mattingly. There is no direct proof that this Pace patent belonged to Lucy Roberts or her predecessors in occupancy; and, if it were a controlling question, we should have to decide whether certain facts indicating such occupancy by her under the Pace patent were sufficient to support a conclusion to that effect. However, for the purposes of this opinion and without intending any decision thereon, we assume that it must be considered that when Mosley entered under the Roberts deed, he took a good title to so much of the boundary as was covered by the Pace patent, and no paper title to the part outside of that patent. The sole question involved in this suit is whether Mosley's actual possession within his deeded boundary operated to give him that constructive possession to the limits of the boundary which is, under the law of Kentucky as well as other states generally, finally sufficient to overcome a better paper title. It is the settled rule in Kentucky that when the alleged disseisor, with color, has good title to part of his described tract and none to the remainder, such actual possession as he takes within the limits of his good title, will be referred to that title only, and that outside of such limits he can prevail against an adverse title only by depending upon actual possession within the interference or overlap between such adverse title and that part of his own entire claim which is only color and not title. We, therefore, assume that Mosley can prevail against defendant only by virtue of his actual possession outside of the Pace patent.[1]

Cleon K. Calvert, of Hyden, Ky., for appellants.
Wm. Ayres, of Pineville, Ky., for appellee.

Before KNAPPEN and DENISON, Circuit Judges, and McCALL, District Judge.

[1] As the defendant's boundaries are stated in the deed to it and as they were shown on the map on which defendant relied during the first hearing, they paid no attention to the Pace patent, but included about half of it, including also a considerable part of the Mosley permanent improvements within the Pace lines. Later, defendant seems to have adopted the theory that Pace was valid and senior to Mattingly and Sizemore, and, accordingly, made a new map and reconstructed its tract so as to exclude Pace. Perhaps defendant ought not to be heard to deny that these improvements are within the interference between plaintiff and defendant; but we give the defendant the benefit of the doubt.

DENISON, Circuit Judge (after stating the facts as above).  [1, 2] The Roberts-Mosley deed was not recorded until 1908, and the first question is whether the doctrine that constructive possession extends to the limits fixed in the deed, applies as well when that instrument is not recorded as when it is.  This has not been expressly decided in Kentucky.  In Poage's Heirs v. Chinn's Heirs, 4 Dana (Ky.) 50, the court was dealing with a statute, but it is apparent that the possession involved was largely of the constructive character now involved.  It was held that record of the immediate instrument under which the disseisors claimed was not essential (see page 55).  True, the conveyance from the state, which was the original source of the disseisor's color, was on record; but this does not seem to be controlling.  In Ring v. Gray, 6 B. Mon. 368, the court had before it the fact that possession had been held under a deed which was void as against creditors because not recorded.  In considering the character of such possession as against other claimants under the common grantor, the court said (page 374):

"No principle is better settled than that the possession of a grantee in a deed, is adverse to a grantor, and it is equally so as between them, whether the deed is recorded or not.  Does the statute, by declaring that an unrecorded deed shall not be good as against a creditor, change the character of the possession as between the parties to such a deed?  Does it convert an adverse into a friendly possession?  We are not aware that it has ever been so decided and we are not prepared to give it that construction."

Possession, under a deed with warranty, is (normally) as hostile and adverse to those claiming under conflicting sources of title as it is to the grantor.  This holding that an unrecorded deed characterizes the possession taken under it seems applicable to the general question we have before us.  In Krauth v. Hahn, 139 Ky. 607, 612, 65 S. W. 18, 19, the question of constructive possession was distinctly involved and it was held that an instruction that to establish adverse possession it must have been "under a title of record to a well-defined and clearly-marked boundary," was erroneous.  The court said:

"A party may, by 15 years' adverse possession, ripen his holding into a title whether he has any title of record or not."

It seems to be a necessary inference from the decision that it applied to that possession which was constructive only as well as to that which was actual.  If so, it decided the point now involved.  In the Burt & Brabb Lumber Co.—Sackett Cases, 147 Ky. 232, 144 S. W. 34, and 150 Ky. 748, 150 S. W. 997, there the mere recital so often found that when possession is taken under a deed of record, it constructively extends to the boundaries named.  This is, of course, true, because the greater includes the less, but whether the rule would be different if the deed were not recorded was not mentioned and perhaps did not occur to the court in these cases.  In Lipps v. Turner, 164 Ky. 626, 176 S. W. 42, it is expressly said:

"The deed must not only be of record, but must describe the land conveyed with reasonable certainty."

The facts of the case show that the deed there involved was of record and that the only question for consideration for the court was as to the

sufficiency of the description. The statement in the opinion that the deed must be of record was clearly at the most the understanding of the writer of the opinion and was not the decision of the court. In Hatfield v. Hatfield (Ky.) 113 S. W. 59, the fact that the deed was unrecorded seemed not to be thought inconsistent with constructive possession thereunder.

This review of the Kentucky cases makes it clear that we must decide the question according to the controlling reasons and the generally established rule. In order to be effective to perfect his right, the possession of the disseisor must be considered to extend as far as the stated boundaries, and must be so notorious as to support the conclusion that the true owner is to be charged with knowledge. If the record of the deed under which the disseisor claims is of any importance, it must be because it bears upon one or the other of these elements of adverse possession—extent or notoriety. When the entry is under a deed and actual possession of a part is taken, the established rule extends the possession to the boundary. Clearly, the matter of record of the deed has nothing to do with this element, extent of possession. One who had actual knowledge of the deed and of the entry under it would not be heard to deny that constructive possession extended to the boundary, even though the deed was not recorded; and this demonstrates that if the lack of record has any bearing it must be upon the other element, notoriety. It can be seen that under some systems of recording, where conveyances are indexed or abstracted according as they touch definite tracts like a subdivision of a government survey, the owner of such a tract could keep himself informed by occasional references to the record as to whether somebody's constructive possession might be extending over his tract, and here there would be room for the thought that recording might aid to give that degree of notoriety necessary to raise the presumption that notice reached the true owner. However that might be, there is scant room for that thought under the Kentucky system. The true owner could get no information as to what conveyances might be recorded from time to time touching his tract—short of reading all of the recorded conveyances—unles he knew the name of some possible grantee, conveyances to whom should be examined; and he could not know the name of such grantee unless he had been upon the property and observed that some person was actually occupying a part. In that event, he could get information as to the extent of the claim by asking the occupant, more easily and more effectually than going to the county records to see if any conveyance to this occupant had been recorded.

The recording statutes of Kentucky, as well as of other states generally, are for the purpose of protecting one who deals with the holder of the record title. They cannot operate as notice, excepting as they themselves declare that operation, and we find nothing in any Kentucky recording statute which makes the record of a deed notice thereof to a claimant under another chain of title.

We see no reason why it should be required that there must be notoriety as to the precise territorial extent of the occupant's claim to lands beyond his house and fields, under such a situation as prevailed in Ken-

tucky at this time. There was no government survey or other practice by which tracts were claimed in quarter sections or in parallelograms; patents and grants were bounded by irregular lines, and an occupied house and field along a creek bottom fairly indicated to all a patent or deed including additional lands extending in some direction and not customarily marked by fences or boundaries obvious to the casual pass-er-by. These conditions furnish an appropriate situation for applying the familiar rule that possession is notice of whatever claim the party has, and that all others are put upon duty to inquire of the occupant as to the character and extent of his claim. If this is the rule to be ap-plied, there is no reason to doubt that inquiry of Mosley at any time within 20 years before suit, would have revealed that he was claim-ing under the Roberts deed to the full extent thereof; but even if the notoriety of the claim to the external limits of the description must be separately established and found otherwise than as an inference from the notoriety of the actual possession, still the record of the deed can-not be controlling. It will be evidence of notoriety as applied to this doubtful zone; but there may be other sufficient evidence. True, a mere claim that a certain line is the boundary line named in a grant will not establish it at that place when it really is somewhere else, no matter how long-continued the assertion; but, upon this matter of con-structive possession, the claim—the mere claim—tells the whole story.

Not only does there seem to be lack of reason for holding that the deed which gives color of title must be recorded, but the decisions gen-erally are clearly to the same negative effect. In Lea v. Polk Co., 62 U. S. (21 How.) 493, 16 L. Ed. 203, the case was evidently in the main one of constructive possession through improvement of a small part, and the Supreme Court held that the record of the deed, under which the entry had been made, was unnecessary. This was by way of con-struction of a Tennessee statute, but the statute did not make any spe-cific reference to constructive possession, and the holding seems to be applicable to the general question. In Minot v. Brooks, 16 N. H. 374, the court says:

"But we are of opinion that, to the extent of the lot, there was notice enough to put any other person who made claim to that lot upon inquiry as to the extent of Brooks' claim and possession, and to charge him with notice of all that he would naturally have learned upon such inquiry; that is, with notice of an adverse possession of the whole lot. It is not necessary to make any record of such an adverse possession. The registry is not provided for that purpose, and no case has been found holding a record of such color of title necessary. Some of the language in Prescott v. Nevers, 4 Mason, 326 [Fed. Cas. No. 11,390], might perhaps be regarded as implying that a record was of some importance, but, if so, the position is not sustained elsewhere nor by the reason of the thing. The evidence of title furnished by adverse posses-sion for 20 years, is said to be founded on a presumption of some grant or agreement, which the law raises for the quieting of possessions and titles. But this presumption of grant does not arise from the fact that the party in possession has any title on record. It exists in full force where nothing exists on the record as to the extent of the actual occupation. The color of title only extends the limits of that occupation constructively. But it is the occupation itself that furnishes the notice, and as we said before the registry is not pro-vided to give limits to it. The actual occupation being of a character to put anyone claiming upon inquiry, he must inquire. If he does so he will be

charged with what he actually learns. If he does not he is chargeable with notice of what he might and would naturally have learned had he done so."

In Roberson v. Downing Co., 120 Ga. 833, 48 S. E. 429, 102 Am. St. Rep. 128, 1 Ann. Cas. 757, Justice Lamar makes an extensive review of authorities and concludes that, in Georgia, a record is not important. In 2 C. J. 181, there is collected a list of decisions from ten different states in support of the same proposition. Not all of these citations are very pertinent, but some of them are; indeed, there seems to be nothing contrary save the cases which take it for granted that there should be a record, and those which more or less vaguely place dependence upon the thought that record gives notoriety.

[3] Upon both reason and authority, we conclude that in Kentucky it is not essential for the deed, which gives color of title, to be recorded while the statute is running, and that if the lack of record is of any importance, it is only because it has evidential value upon the issue whether the true owner is chargeable with notice that the disseisors claim to the full extent.

The case was decided below upon the theory or the finding that two of the five calls or boundaries of the deed were not sufficiently certain and well defined to meet the requirements of the Kentucky rule to the effect that the benefit of constructive possession up to the stated boundaries can be had only when they are well defined. The Kentucky cases say that, for this purpose, the boundaries must be natural objects or marked boundaries or well-defined boundaries. In this case, the natural objects which constitute the alleged boundary, as these objects have been recited by us, lend some force to the contention that it is complete; but they are not, of themselves, sufficient, nor is there satisfactory evidence that the line was marked in any usual way. We therefore come to the meaning of "well-defined." Just to what extent and how the line should be defined in order to be well-defined seemed to have been left in some confusion by the Kentucky decisions.

In construing patents and other grants, as between conflicting claims of title, the Kentucky courts have been extremely liberal in an endeavor to close the lines of the grant and not to permit it to fail for lack of accuracy in description. If a given course was too short to reach the place where it was expected to get, thus leaving a gap, the course was continued, or deflected and continued, until the desired location was reached and the gap was bridged; but as to boundaries which will support a constructive possession, it was held that the leaving of a gap between two calls was fatal. King v. Eagle Co., 144 Ky. 660, 139 S. W. 863.

If this and some others of the earlier cases are inconsistent with the general rule of construction, they must be thought of as overruled by Burt Lumber Co. v. Sackett, supra (see 147 Ky. 240, 144 S. W. 34). The test there was said to be whether the lines were so described that they could be run by a surveyor, and one of the boundaries in the deed there involved was the "conditional line" of a specified adjoining owner. It is the familiar and undoubted rule in Kentucky that the description in a deed is sufficiently definite when it calls for any-

thing to serve as a monument, if that monument can be found by a surveyor by resorting to sources of information familiar in the vicinity or known to the neighborhood or otherwise open to him; and we are unable to perceive any distinction in principle between a description sufficient to identify property conveyed and one sufficient to identify property held. Only a clearly established local rule would justify this court in recognizing such a distinction.

It follows that the Roberts-Mosley deed makes a sufficient basis for constructive possession of the whole tract, if, when it was made and thereafter, it could be located upon the ground with substantial certainty by any one desiring to do so.

The description in the deed is this:

"Beginning at a conditional [line] between J. H. Bowlin and Lucy Roberts, on a chinquapin tree; thence up the point to the top of the ridge; thence with the top of the ridge to the head of the Stokley-Bowlin branch; thence with the ridge to the head of the Old House branch; thence binding on I. Mattingly's line; thence with a conditional line between C. H. Godsey and William Muncey to a water oak below Samuel Morgan's field; thence back to the beginning—containing 200 acres be the same more or less."

The first two boundaries and the last one, being those shown on the sketch map as A B, B C, and G A, everybody agrees are well-known and definitely located lines. The third boundary, that marked C D, is perfectly certain as to its course, and the chief uncertainty as to its end comes from a question as to the names of the two branches. We agree with the court below that, beyond any fair doubt, this call extends to the vicinity of the point marked D. Boundaries 4 and 5, those marked D E and E F G, are challenged. It seems to be apparent that, when the deed was made, Lucy Roberts was occupying land upon the north side of the ridge D E, claiming to the top, and Mattingly was doing the same upon the south side. I. Mattingly held under two old patents issued to his father. It does not appear whether, in 1882, they had been surveyed. Very likely Mattingly did not know where the north lines were. As they were run by defendant's surveyor and platted upon his map, the northerly line of one of them has approximately the length and course of the line D E, but is some distance south thereof. One of the north lines of the other patent, as so platted, touches the line D E, but is shorter and is not parallel. We cannot have implicit confidence in the location of these patents as thus platted. If the larger Mattingly patent is laid down upon defendant's map used on the second hearing, in the same relation to the stream there shown as is found between the same patent and the same stream in defendant's map used on the first hearing, the north line of this patent would not be far away from the line D E. However, assuming that these patent lines are as platted on defendant's map, that is not conclusive. I. Mattingly had continued to live in the neighborhood. He showed a part of this line along the top of the ridge to Mosley's surveyors, in the preparation for the first hearing, and he showed the whole line to them in the preparation for the second hearing. Defendant's surveyor, who could not find this line, purposely refrained from asking Mattingly where it was. Members of the Roberts, Mosley and Mattingly families,

259 F.—8

all intermarried, and no other persons, have lived upon both sides of the line ever since long before the deed was made. There is no reason to think that any one in the neighborhood had any doubt where this line was or would have failed to point it out as an old and known line to any surveyor who inquired for it.

Such uncertainty as there now is apparently only began when defendant's surveyor undertook to run out the Mattingly patents and declared the community was mistaken. Further, it appears that Henry Mosley, just before his death in 1883, made a survey and took a patent of land which was bounded on the north in part by this same ridge, and apparently had in mind that he was coming north to the existing line. Again, it seems that the Mosley family purchased this Mattingly property so as to add it to what they already had, to make a continuous tract, and in 1885 I. Mattingly made a deed to the Mosley heirs. This deed was at once recorded. Some of its stated boundaries are hard to follow, but there is no doubt that it describes a great part of the line D E, and, reversed from E, runs west along the ridge, across Muncey's creek and up and along the ridge west of the creek. It describes natural objects which make this clear, and it also says that it is "along the Mosley line." The attempt of the defendant's surveyor to superimpose this deed upon the Mattingly patents, as he has them platted, and half a mile away from the ridge, must be entirely rejected; it is not plausible. Not only does the deed on its face describe this ridge with sufficient certainty, but I. Mattingly, as a witness for defendant, says that it was intended to do so, and W. H. Mattingly, a surveyor, testifying for defendant, says that it does in fact do so. When we take the cumulative effect of the facts that Roberts and Mattingly, on respective sides, each claimed to this line, that it was offered by Roberts and accepted by Mosley as a known boundary sufficient for a deed, that it has always been known and understood in the neighborhood as the line and that it was called for and described as the existing line in a deed between the same parties a little later and 20 years before suit brought, we think it measures up to the requirements of a "well-defined" line, for the purposes now involved, and that its easterly end is definitely located at the point E.

It was distinctly held in Mosley v. Eversole, 148 Ky. 685, 147 S. W. 426, that where two adjoining occupants, neither of whom had any title, differed about their dividing line and got their neighbors to fix it for them, thus making a "conditional line," which was recognized for a long period, that became a sufficient boundary. There is not much difference between a line fixed by arbitration and one fixed by agreement or common consent. It must be remembered that we are not accepting a line thus fixed and using it for the direct purpose of divesting the title of another. While it comes to that in the end, wholly different considerations are involved. No matter if the line, up to which respective claims have been made and acquiesced in, forms a natural object, like a river, or a marked line, like a fence (and surely satisfies the rule for constructive possession), the existence of this line would not, of itself, shift the title; but here we are only seeking a definition of a term used in an established rule, and the reason for re-

quiring a line to be well-defined is that the true owner, if, being put upon notice, he seeks to ascertain how far the color of title goes, may not be left to the mere arbitrary claim of the disseisor, but may be sufficiently informed by the deed.

The westerly end of the call for the Mattingly line is more indefinite, but its precise location is not important. The previous call follows the ridge "to the head of the Old House branch." This is not, necessarily, a definite spot. The "head of the Old House branch" may well be the summit of the ridge which bounds the headwaters of that branch, and since this ridge does, at some place in this vicinity, come to be "binding on the I. Mattingly line," the description plainly means that the ridge shall be followed till the Mattingly line is reached. This is the necessary implication from "thence"; this word purports to continue the next preceding call until it reaches the point where the line introduced by "thence" may rightly begin. It is of no importance whether that line is reached exactly at the point E or somewhere further east along the ridge.

The boundary E F G, "thence, with a conditional line," etc., presents this question: The easterly running part F G undoubtedly responds to the call and is a definite line, established by arbitrators in 1849. This was the point involved and this was decided in Mosley v. Eversole, supra. The part E F, which runs north along the summit of the ridge, was not involved in that case; but since the call to run with the I. Mattingly line is exhausted at E, it may be thought that there will be a fatal deficiency if there is no reason for following the ridge from E to F, although perhaps the Kentucky decisions would justify closing this gap by a straight line. We think that the facts, as developed in this case and as recited by the Court of Appeals of Kentucky in the case just cited (all parties seem to agree that the facts found in that case are to be considered as in this record), justify the conclusion that there is no gap. Godsey doubtless claimed the west side of this ridge, E F, as well as the land north of F G. His house was west of E F; Muncey's house was just across, east of the ridge; each was close to it.

Not only is it plain that this ridge, E F, was part of the dividing line between Godsey and Muncey, but the patent afterwards issued to Muncey's successor in interest shows that Muncey's west patent line ran south practically along this ridge, from F almost to E, or beyond E, according as to whether we move the side line south to correspond to the arbitrators' location of the north line. There is absolutely nothing to show whether those who established the east and west conditional line between Godsey and Muncey along the disputed boundary also ran this line south along the undisputed boundary. There is no particular reason why they should have done so, nor why they might not have done so; but it is plain enough that practically the entire line E F G was the existing and well-known line of 1849 between Godsey and Muncey. The only defect in the call for it in the Roberts-Mosley deed is that perhaps only part of it was "conditional." If the call had omitted this word "conditional," there would be no ambiguity (unless for a few poles), and we cannot think that referring to the line in

that way when perhaps part of it was not conditional but undisputed, is a very substantial defect. Further, Roberts and Mosley, in 1882, evidently understood that the conditional line came to E. and Mosley testified that it did. As against this testimony, there is only the fact that in the Mosley-Eversole Case Mosley's map did not show that the line came south of F; but in that case the only litigated and the only important question was whether the line coming from the east stopped at G, or came on as far as F, and the fact that Mosley only undertook to claim and establish that part from G to F is not seriously inconsistent with his position here. In that case, he was defendant. His title to the whole boundaries of his deed by adverse possession was not very important. His defense was that the title of his opponent, Muncey's successor, did not extend north of the conditional line F G so as to reach the spot in controversy, which was immediately north of that line.

Upon the whole case, we feel bound to conclude that the boundaries named in the Roberts-Mosley deed were sufficiently well defined to make a basis for a constructive adverse possession extending to them. Actual possession thereunder, within the interference, sufficiently appears. As to the interference with the Mattingly grant, defendant, by its map and testimony, conceded on the first hearing that Mosley's old field and inclosure extended beyond the Pace patent and covered about 3 acres of Mattingly. On application for further hearing, defendant's map and affidavits showed that the Pace patent, rightly located, covered all of Mosley's fields. Upon the further hearing, defendant's map omitted to show the fields but defendant's testimony again conceded the three-acre overlap. Since no two of these three maps are wholly alike in locating the Pace patent, and such explanation as is attempted of the discrepancies is incomplete, we are inclined to accept the apparently careful location made by plaintiff's surveyors, which shows a considerably larger overlap; but this is not important. Three acres are enough. There is no proof that defendant or its predecessors did not fully understand that this extended field was within the Mattingly location.[2]

[4] As to the Sizemore interference, the case is even clearer. About 1888, the Mosley heirs cleared a field of 12 or 14 acres in the southwest part of plaintiff's boundaries, far away from the Pace patent and toward the far side of the Sizemore grant. The evidence seems to be undisputed, given by defendant's witnesses as well as plaintiffs', that this field was thereafter continuously inclosed—the fence being once rebuilt—and was in crops every other year until about 1907. In alternate years, it was used for pasture. Persistent and unbroken cultiva-

---

[2] Defendant's latest map of its claimed tract undertakes to run around, and, therefore, exclude, this 3-acre parcel. There is enough ambiguity in the deed to defendant to give some plausibility to this construction of its boundary, if it had originally adopted this view; but its first map and testimony committed it to the other location of its line. Its later action in changing the exterior boundary of the tract it claimed was, therefore, only a voluntary disclaimer during the trial of the parcel which the proofs had shown had been adversely occupied by Mosley. Such a disclaimer cannot be allowed to destroy any constructive possession under color of title which would otherwise be sufficient.

tion every other year for about 20 years, while in alternate years the land rests but the inclosure is maintained, and by people living in close-by houses, fully satisfies the Kentucky standard of actual, continuous possession. A generally similar occupation appears as to a field of 6 or 8 acres in the southeast part of plaintiffs' boundary, and part of which was within the Sizemore interference. Still clearer is plaintiffs' case, if the deed of 1890, under which defendant claims, made by the owner of Mattingly and Sizemore, and which conveyed both by reference only to one outside line, is given effect to transform them into one unitary tract, as it probably does. In that event, there has been actual possession of three scattered pieces, aggregating perhaps 20 acres, all within the single interference between the claims of the two parties.

The only remaining question is whether Mosley's conduct has been inconsistent with that claim of exclusive right, up to his boundaries, which would otherwise be the natural inference from his actual possession. Several facts are said to show such inconsistency. At different times, members of the Morgan family cut timber within the northern part of Mosley's boundary. We must assume that this cutting was within certain patents to Morgan and Bowlin, and was outside of lands deeded to defendant under Mattingly, and that Mosley had never taken actual possession anywhere within the interference between himself and Bowlin, or anywhere within that part of the Morgan grant which had any valid existence as against Mattingly. It may therefore well be true (although not here involved) that Mosley had no rights which he could maintain as against this timber cutting by the Morgans, and some degree of acquiescence by him therein is not inconsistent with giving his actual possession within the Mattingly interference the full effect which it could lawfully have. The rule that actual possession must be hostile "against all the world" cannot apply to constructive possession extending to the described limit, where it comes in conflict with the Kentucky rule that this constructive possession may exist as against some interfering owners, and not as against others.

In 1908, apparently after his title by adverse possession became perfect, Mosley was cutting timber on the Mattingly interference. One who had purchased standing timber from the defendant brought suit against Mosley and recovered the value of four or five trees. This is not claimed to be an adjudication against Mosley, because of difference in parties, nor can we see that it indicates any inconsistency on Mosley's part. There was some other cutting of timber within the Mattingly interference, and without protest from Mosley, about 1901; but it does not appear that Mosley knew this was upon his side of the boundary, nor that it was important enough to require protest, considering the value of timber at that time. It is also said that Mosley pointed out the line which he claimed, at a point well beyond the Pace patent and far within his deeded boundary. He denies this, and it is not very credible. He was also at one time willing to pay a small price for a conveyance of the Mattingly title. This may well evidence prudence, rather than cowardice. Mosley's map, prepared for the Mosley-Eversole Case, shows a theory of fixing the Mattingly line somewhat different

from his present theory; but the result was not substantially different. The question was not material to that case nor did the map cut any particular figure, so far as we are informed. The map evidences, at the most, a temporary adoption of an erroneous theory of construction, and does not estop him from adopting the right theory when it is so well established as it is in this case. He should not be penalized for saying frankly as a witness in a former case that he was not certain how the deed would be construed, nor for there saying—what was true —that he was not "in this case" claiming the whole boundary covered by the Roberts deed. Upon the whole, we think such circumstances of doubt as there are regarding Mosley's continual claim to the limits of the deed are not sufficient, as against this defendant, to overcome the legal effect of his actual and notorious occupation of at least three parcels scattered in widely different parts of the tract claimed by defendant.

We conclude that the decree must be reversed, and the case remanded for a new decree in accordance with this opinion.