NORTHERN PACIFIC RAILWAY CO., RESPONDENT, *v.* CASH, APPELLANT.

(No. 5,252.)

(Submitted May 25, 1923. Decided June 21, 1923.)

[216 Pac. 782.]

*Ejectment—Adverse Possession—Matter of Intention—Mistake as to Boundaries—Rule—Real Property—Possession—Presumptions.*

Ejectment—Public Lands—Northern Pacific Land Grant—Lieu Lands—Adverse Possession.
    1.   Since title to land within the indemnity strip mentioned in the Northern Pacific land grant did not vest in the railway company until 1904, when the company made its selection and the selection was approved, and title to land cannot be acquired by adverse possession as against the federal government, an alleged adverse holding of a tract within such strip could not commence to run until that year.
Same—Adverse Possession—Continuity Broken by Application for Lease.
    2.   Where the predecessor of defendant in an action in ejectment had held the land in controversy for seven years and thereupon applied

---

2.   Necessity of unbroken continuity to found title by adverse possession, see note in 15 L. R. A. (n. s.) 1202.

to plaintiff for a lease to the land, his application for the lease was *prima facie* a recognition of plaintiff's paramount title and operated to break the continuity of his alleged adverse holding.

Same—Adverse Possession—Rules.

3.   Evidence of defendant, viewed in the light of the rules that possession of real estate may be open and notorious and still not adverse, that occupation thereof by one not the owner is deemed to have been under and in subordination to the legal title, and that the question of adverse possession is one of intention, *held* not to support his claim that when his predecessor in interest made an application to plaintiff for a lease to the land in question he did not know that the land attempted to be leased was part of the land claimed by adverse possession.

Same—Adverse Possession a Matter of Intention—Mistake as to Boundaries.

4.   Since the question of adverse possession is one of intention, it follows that where occupation of the land was by mistake and with no intention on the part of the occupant to claim land as his own which did not belong to him but with the intention to claim only to the true line, wherever it was, his intention was conditional and his possession not adverse.

Same—Adverse Possession—Failure to Assert Title on Demand for Rent —Effect.

5.   Failure of the predecessor of defendant in an action in ejectment to assert claim to land alleged to have been held adversely by him, when demand was made by plaintiff railway company for rent for its use, was evidence that he recognized the paramount title of plaintiff.

Real Property—Possession—Presumptions.

6.   Where possession of land is held under a deed it is presumed that the grantee entered into possession under it, claiming title only to the land described therein, and that his possession was restricted to the premises granted.

*Appeal from District Court, Ravalli County; James M. Self, Judge.*

EJECTMENT by the Northern Pacific Railway Company against Frank Cash. Judgment for plaintiff and defendant appeals. Affirmed.

*Messrs. Taylor & Higgins,* for Appellant, submitted a brief; *Mr. J. D. Taylor* argued the cause orally.

It is the contention of the respondent that the entry of the Swigerts upon the land in question could not ripen into title

---

4.   Adverse possession due to ignorance or mistake as to bounear    see notes in 24 **Am. St. Rep.** 388; 15 **Ann. Cas.** 827; **Ann. Cas.** 1912A, 450; 21 **L. R. A.** 829; 33 **L. R. A. (n. s.)** 923.

by adverse possession. The entry of the Swigerts upon the land in question was made and they took possession under misapprehension or mistake. The rule that such an entry will, if open, notorious and hostile and held for the statutory period of time, ripen into title by adverse possession is declaratory of the weight of authority and is approved in a recent case of this court in *Rude* v. *Marshall,* 54 Mont. 33, 166 Pac. 298. (See, also, *Woodward* v. *Faris,* 109 Cal. 12, 41 Pac. 782; *Parker* v. *Wold,* 69 Or. 446, 138 Pac. 463; *Wissinger* v. Reed, 69 Wash. 684, 125 Pac. 1030.)

We apprehend that counsel will contend that Edwards, during his tenure of this tract of land, tolled the statute, and thus prevented the acquisition of title by adverse possession by the appellant by making application to lease certain tracts of land belonging to the respondent, of which the tract here in question proved to be a part. We cannot believe, however, that the court will entertain any such contention. It is true that Edwards attempted to lease several tracts of land from the respondent but at no time did he have knowledge that the land here in question was a part thereof. It seems unreasonable to urge that he would make an attempt to lease land which he and his predecessors in interest had held unmolested for a period of approximately twenty years.

*Messrs. Gunn, Rasch & Hall,* for Respondent, submitted a brief; *Mr. E. M. Hall* argued the cause orally.

This evidence made a *prima facie* case on behalf of the plaintiff, and entitles it to a judgment, unless the defendant has proven by a preponderance of the evidence that he has acquired title to the land by adverse possession. (*Collins* v. *Thode,* 54 Mont. 405, 170 Pac. 940.) As the company's list, selecting this land for patent, was not approved until October, 1904, and the land not patented until that date, adverse possession could not commence to run against the land until

then, even though it may have been inclosed for many years prior. (2 C. J., p. 216, sec. 450; *Clark* v. *Barnard,* 15 Mont. 176, 38 Pac. 834; *Slaght* v. *Northern Pac. Ry. Co.,* 39 Wash. 576, 81 Pac. 1062; affirmed in 205 U. S. 133, 51 L. Ed. 742, 27 Sup. Ct. Rep. 442 [see, also, Rose's U. S. Notes]; 22 R. C. L. 293; 32 Cyc. 960.) No adverse possession can run prior to selection and approval by the secretary of the interior. (*Young* v. *Chainquist,* 114 Iowa, 116, 86 N. W. 205; *Northern Pac. Ry. Co.* v. *McComas,* 250 U. S. 385, 63 L. Ed. 1049, 39 Sup. Ct. Rep. 546.)

"An offer by the claimant to lease the land from another also breaks the continuity of the adverse possession as against such other." (2 C. J., p. 104, sec. 147; *Risher* v. *Madson,* 94 Neb. 72, 142 N. W. 700; *Northern Pac. Ry. Co.* v. *George,* 51 Wash. 303, 98 Pac. 1126; *Blackfoot Land Development Co.* v. *Burks,* 60 Mont. 544, 199 Pac. 685.) "The recognition of the true owner's title need not be made directly to such owner; unqualified recognition made to a third person is sufficient." (2 C. J., p. 102, sec. 138.) "Failure to assert rights in land when asked to pay rent amounts to a recognition of title in another." (*Cutting* v. *Burnes,* 57 App. Div. 185, 68 N. Y. Supp. 269.)

There is nothing in the testimony of Edwards to show any intention on his part to claim any railroad land. In fact, he disavowed any such intention. The evidence also shows that neither Edwards nor Cash ever paid taxes on any portion of the northeast quarter of the northwest quarter of section 23. Under these circumstances, the case of *Blackfoot Land Dev. Co.* v. *Burks,* 60 Mont. 544, 199 Pac. 685, is decisive in favor of plaintiff. The railroad land was unoccupied and the owner thereof had no knowledge of the fence being on its land until 1918, so there could be no acquiescence on its part until that time. (*Fisher* v. *Muecke,* 82 Iowa, 547, 48 N. W. 963; *Stearns* v. *Jewell,* 27 Colo. App. 390, 149 Pac. 846;

*Shank* v. *Williams*, 93 Kan. 573, 144 Pac. 1007; *Austin* v. *Baxter*, 189 Iowa, 138, 176 N. W. 777; 2 C. J., sec. 243.)

MR. JUSTICE HOLLOWAY delivered the opinion of the court.

This is an action in ejectment instituted by the Northern Pacific Railway Company against Frank Cash to recover possession of the northeast quarter of the northwest quarter of section 23, township 5 north, range 20 west in Ravalli county. The complaint is in the usual form. The answer admits the corporate existence of the plaintiff and denies all the other allegations of the complaint. As an affirmative defense defendant in effect alleged that for more than ten years prior to the commencement of this action he and his predecessors in interest had been in the open, notorious, adverse, continuous and exclusive possession of all that portion of the northeast quarter of the northwest quarter of section 23 lying south and west of the county road as it runs through said forty-acre tract, and prayed that his title thereto be quieted. The reply is substantially a general denial.

The trial of the cause to the court without a jury resulted in findings in favor of the plaintiff, and from the judgment entered thereon defendant appealed. The errors assigned present one question: Does the evidence justify the conclusion that defendant did not acquire title to the disputed area by adverse possession?

The evidence discloses these facts: As early as 1889 John G. Swigert made settlement upon the northwest quarter of the northwest quarter and the south half of the northwest quarter of section 23; that he inclosed the land and later entered it and secured patent; that in fencing his land he included within the inclosure that portion of the northeast quarter of the northwest quarter lying south and west of the road, which is the tract now in controversy. Swigert continued in possession and farmed the land until 1907, when he

sold to P. H. Edwards. Thereafter Edwards continued in possession and cultivated the land, including the area in controversy, until 1918, when he sold to Cash the land which he had purchased from Swigert. Swigert and Cash each believed that the fence along the public road marked one of the exterior boundaries of the land to which Swigert had received patent. Neither of them laid claim to any part of the northeast quarter of the northwest quarter, but each of them believed that the area in dispute and included within the Swigert fence constituted a part of the Swigert land. In October, 1904, the northeast quarter of the northwest quarter of section 23 was selected by the railway company with other tracts as lieu land under its congressional grant. The selection was approved and patent issued to the railway company. During 1911 Edwards made two applications to the railway company to lease the northeast quarter of the northwest quarter.

Although the land in controversy is within the indemnity [1] strip mentioned in the grant to the railway company, title did not vest in the company until the selection was made and approved in 1904. Up to that time the land was public land, subject to disposition by the Congress as it saw fit. (*Kansas Pac. R. Co.* v. *Atchison R. Co.,* 112 U. S. 414, 28 L. Ed. 794, 5 Sup. Ct. Rep. 208 [see, also, Rose's U. S. Notes].) It is elementary that the statute of limitations does not run against the government of the United States; hence as against it title to land cannot be acquired by adverse possession. (*Lindsey* v. *Miller,* 6 Pet. 666, 8 L. Ed. 538 [see, also, Rose's U. S. Notes]; *Gibson* v. *Chouteau,* 13 Wall. 92, 20 L. Ed. 534.) Since the government did not part with its title to the land in controversy until October, 1904, it is altogether immaterial what Swigert may have done with the land prior to that date. (*Clark* v. *Barnard,* 15 Mont. 176, 38 Pac. 834.) Nothing that he could do could set the statute of limitations in motion. Under the most favorable view,

the statute commenced to run in October, 1904; hence the adverse possession of Swigert and Edwards, his successor, if it was adverse, had not ripened into title in 1911, when Edwards applied to lease the land. If we assume that from 1904 to 1911 Swigert and Edwards successively claimed the [2] disputed area and held it adversely, the application by Edwards to lease the land in October, 1911, was *prima facie* a recognition of the railway company's paramount title which operated to break the continuity of his adverse holding, and since this action was commenced before the expiration of ten years from October, 1911, the statutory period never elapsed so as to give rise to defendant's claim of title by prescription.

The foregoing as general principles of law are not ques-[3] tioned by defendant, and neither is it controverted that Edwards applied to the railway company in 1911 to lease this disputed area. Defendant contends, however, that Edwards held the land adversely and that his application to lease did not toll the statute, since he did not know at the time of his application that any part of the land applied for was within his own inclosure. By taking detached portions of Edwards' testimony and weaving them into a connected story, support may be found for this contention; but his testimony as a whole certainly suggests a grave doubt whether he did hold adversely up to October, 1911, or subsequently. It must be conceded that the legal title to the disputed area was in the railway company from 1904 to 1914 at least. Edward's testimony is to be read in the light of these fundamental rules: (a) Possession of real estate may be open and notorious and still not be adverse. (b) The occupation of property by one not the owner is deemed to have been under and in subordination to the legal title. (c) The question of adverse possession is one of intention. The intention is to be discovered from all the surrounding circumstances. (*Blackfoot Land Development Co.* v. *Burks,* 60 Mont. 544, 199 Pac. 685.)

For the purpose of illustrating the testimony, a plat of the northwest quarter of section 23 is submitted:

The three forty-acre tracts each marked "1" belonged to Edwards at the time he made application to lease. For each of these tracts he held a deed from Swigert. The forty marked "3" was included in his application to lease. The dotted lines show substantially the location of the road and also the fence, which inclosed with the Edwards land the triangular piece which is the area in dispute. A portion of Edwards' testimony follows: "Q. That land lying south and west of the fence, did you claim that? A. No, some railway land, I never claimed to own that.. * * * All the land was below the road that I owned on the right-hand side going up. Q. Did it go up to the fence? Did you claim right up to the fence? A. I did so far as I know. Whether there was any land inside there that didn't belong to me, I don't know. Q. You claimed all of it? A. I never had it surveyed, never run the lines out. Q. You claimed to own all of it? A. It was inside the fence the same as when I bought it. I don't claim to own and don't claim to know who does own it. Q. And that is what you sold to Mr. Cash? A. What I sold to Mr. Cash I had a deed for. Q. And you

intended that to include all the land that you had under fence? A. Not necessarily, if there was any land I didn't own. I never surveyed it. The road is in the same place now that it was when I bought the land and years before I bought it. * * * Q. Did you pay the taxes on it? A. Not that I know of. I just paid the taxes on what I had a deed for. * * * Q. All the land you claim is— A. Right on the deed. You can see the deed, the deed I got from Swigert. * * * Q. But you never intended to lease from the railway company any land that you had already fenced and had under cultivation? A. I did not know I had any inside the fence. * * * Q. You thought the fence was the boundaries of the land when you bought the land? A. Yes, the land inside the fence. * * * Q. At the time you made application to lease the northeast quarter of the northwest quarter you did not know your fence included any of the forty? A. I did not. Q. And you were not at that time claiming any railway land? A. No. Q. You never did claim any railway land? A. No, I did not."

He testified that until the survey was made in 1919 or 1920 he assumed that the fence was on the boundary line. Whatever may be said of this testimony, it comprises only a portion of the evidence which reflects upon Edwards' claim of adverse possession and his claim that he did not know that any railway land was included by his fence at the time he made application to lease.

Frank Cash, the defendant, testified that at the time he purchased, Edwards told him that there was railway land within the inclosure—land which he (Edwards) had purchased from the railway company.

Mr. Cooney, an employee of the land department of the railway company, testified that in 1911 he went to see Edwards concerning the northeast quarter of the northwest quarter of section 23; that at that time Edwards claimed to have the land under lease from the railway company but refused to produce the lease; that witness ascertained that the

67 Mont.—38

claim was wholly unfounded, but that Edwards had been using this land for some considerable time; that the railway company refused to lease to Edwards unless he would pay some rental for the use which he had made of the land; that later in the same year he again called upon Edwards concerning a lease of this land, and that Edwards then told him that he did not want the lease, but that his partner, Strange, wanted it; and that Edwards did not at any time make claim to the disputed area. M. E. Persons, also an employee of the land department of the railway company, testified that he met Edwards in 1918 and had a conversation with him concerning the area in dispute; that Edwards told him that he had sold his holdings in that vicinity and did not want to buy any railway land, but that Edwards did not make any claim to the area in dispute. Edwards testified that W. A. Strange had acted as his agent in procuring the purchase of the Swigert land. Strange testified to the same fact, and further that at the time the purchase was made, Swigert told him that there was railway land within the inclosure but that it could be purchased from the railway company; that he communicated this information to Edwards; that Edwards frequently referred to the land as railway land and at one time claimed to have a lease upon it.

From the testimony the trial court was fully justified in finding as a fact that Edwards did not intend to claim any part of the disputed area adversely to the railway company. The court found that Edwards made application to lease the northeast quarter of the northwest quarter of section 23 in 1911, but did not find specifically that he knew that a portion was included within his own inclosure. If such a finding was necessary to support the judgment, it would be implied, and it could be found fairly from this testimony. [4] It may be conceded that originally the disputed area was included by Swigert through mistake as to the boundary line of his patented land and that he believed that the fence was on the true line. Likewise we may assume for the

purposes of this appeal that Edwards also believed that the fence was upon the true boundary line. The mere fact of the mistake is not material one way or the other. The rule was stated by this court in *Rude* v. *Marshall*, 54 Mont. 27, 166 Pac. 298, as follows: "Where a person, acting under a mistake as to the true boundary line between his land and that of another, takes possession of land of another, believing it to be his own up to a mistaken line, claiming title to it and so holds, the holding is adverse, and, if continued for the requisite period, will give title by adverse possession. And the fact that on taking possession he had no intention of taking what did not belong to him, or claimed that he had no desire or intention to take any land belonging to the adjoining owner, or that he would have surrendered possession if he had known that the land in dispute was not within the calls of his deed, or that the owner of the record title was ignorant of the location of the true boundary line or of the fact that the land was his, or supposed that the adverse occupant intended to claim only what he actually owned, or the fact that both owners were mistaken as to the true boundary line, does not affect the operation of the rule."

As observed heretofore, the question of adverse possession is one of intention; hence it follows that where the occupation is by mistake and with no intention on the part of the occupant to claim as his own land which does not belong to him but with the intention to claim only to the true line, wherever it may be, the holding is not adverse. (2 C. J. 139.) In other words, it is not the presence or absence of the mistake which enters into the determination of the question, but the presence or absence of the requisite intention to claim title which gives character to the entry and determines the question of disseizin. (1 Cyc. 1038.)

In order to constitute the possession of this disputed area adverse, it must have been held with the clear intention on the part of Edwards to claim to the fence as the true line,

whether it was the true line or not. If his intention was
to claim to the fence only upon the assumption that it was
on the true line, the intention was conditional and the pos-
session not adverse. (*Edwards* v. *Fleming,* 83 Kan. 653,
33 L. R. A. (n. s.) 923, and note, 112 Pac. 836.) Further-
[5] more, the failure of Edwards to assert any claim to
the disputed area when the demand was made upon him by the
railway company to pay rent for his use of the land may be
considered fairly as additional evidence that he recognized
the paramount title of the company. (*Cutting* v. *Burnes,* 57
App. Div. 185, 68 N. Y. Supp. 269.) In the deed from
Swigert to Edwards and in the deed from Edwards to Cash
there is not any mention made of the disputed area. Neither
Swigert, Edwards nor Cash claimed the disputed area under
any written instrument. But if the possession of Swigert and
Edwards was adverse and that possession ripened into title
by prescription, the title remains in Edwards, for it is per-
fectly apparent from this record that Edwards did not
assume to transfer to Cash the disputed area. Edwards en-
tered into possession under his deed from Swigert and mani-
festly held and asserted his right to possession under that
deed and not otherwise. Two presumptions obtain with re-
spect to the possession of real estate: (1) That the possession
[6] is held subservient to the legal title (sec. 9018, Rev.
Codes 1921); and (2) that where possession is held under a
deed it is presumed that the grantee entered into his pos-
session under the deed, claiming title only to the land de-
scribed therein, and that his possession was restricted to the
premises granted (*Fuller* v. *Worth,* 91 Wis. 406, 64 N. W.
995).

It is our conclusion that the defendant did not overcome
either of these presumptions and that the evidence justifies
the inference that with full knowledge of the facts Edwards
applied for a lease upon the area in dispute. Under the
view most favorable to defendant, the utmost that can be

said is that the evidence under the material issues is in con-flict.

From these premises the conclusion follows that the judg-ment is correct, and accordingly it is affirmed.

*Affirmed.*

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES COOPER, GALEN and STARK concur.