## Warfield Natural Gas Co. et al. v. Ward et al.

June 18, 1940.

As Modified on Denial of Rehearing March 28, 1941.

74

76

Kirk & Wells, W. R. McCoy, A. R. Kingdon and Harold A. Ritz for appellants.

Howes & Walker for appellees Ward's Heirs.

W. J. Ward, pro se.

OPINION OF THE COURT BY STANLEY, COMMISSIONER— Affirming.

The case involves the title to oil and gas under about 660 acres located on the Left Fork of Big Elk Creek, a tributary of Tug Fork of Big Sandy River. The facts are complex and the evidence conflicting. Six years passed between the filing of the suit and rendition of the judgment, during which the record of nearly 5,000 pages was built up. Not much more than a general statement of the contentions of the parties and our conclusions may be stated without an opinion of undesirable length.

The suit was brought by a number of parties who, for convenience, are denominated as the heirs of W. J. Ward, Sr., or as Ward's Heirs, against the Warfield Natural Gas Company, and Lewis Dempsey. The plaintiffs prayed that their title be quieted; that the defendants render an accounting of gas extracted from the land; and that the plaintiff recover $10,000 for its value, and $200, unpaid rentals. Injunctive relief was also sought. There were many amended pleadings and intervening petitions along the way, but the essential issues and the relief sought remained about the same. In the main, that relief was granted, excepting a 100-acre parcel. The case was referred to the master commissioner for an accounting, and no definite sum was adjudged the plaintiffs as damages or compensation. The defendants named above and others who during the course of the preparation and trial were brought into the case to defend their titles or warranties, or who assumed a like position in whole or in part, have appealed from the judgment in favor of Ward's Heirs. The latter have been granted an appeal against certain parties and a cross-appeal against the appellants.

The plaintiffs claim a record title deducible from five patents issued by Kentucky in 1855, 1858, 1862, and 1880 to John Chapman, George Chapman and John Hobbs, respectively. The defendants claim a superior title through descent or conveyance from a patent issued by Virginia to Benjamin Say on November 13, 1786, for

15,000 acres which embraces the major part of the land claimed by the plaintiffs. A portion of the disputed land is outside the Say patent and is covered by a patent for 5,217 acres issued to Benjamin Fuller, on the same day, which is also owned or claimed by the appellants. But attention is principally directed to the Say patent and its location. In addition to claiming both surface and minerals under this senior and superior title, Dempsey (an appellant whose interest apparently is that of the Warfield Company) claims the surface and 2/8 undivided interest in the minerals through the same chain of title relied on by the Wards. In rebuttal, plaintiffs deny the location of the Benjamin Say patent contended for by the defendants (now appellants) and maintain their land is not covered by that instrument. The plaintiffs also rely upon limitations and title by adverse possession. The defendants controvert those claims. There are many subordinate or incidental situations and claims presenting material issues and important individual rights, which are but branches of the main body of the case thus stated.

1. We are confronted, first, with the issue as to whether or not the lands in controversy are covered by the patent to which the appellants trace title, that is, to the Benjamin Say patent of 15,000 acres. It was issued on November 13, 1786, on a survey dated March 29, 1785, in the name of Thomas Lyons. The location of this patent has been in question for several years. Burger v. Allen, 211 Ky. 742, 277 S. W. 1032; Warfield Natural Gas Company v. Danks, 271 Ky. 452, 112 S. W. (2d) 674. The survey does not detail the river calls. The description in this patent is as follows:

"Lying and being in the county of Fayette adjoining Phillip Lyons Survey and bounded as follows: Beginning at a beech tree South East corner to Phillip Lyons survey, thence up the North branch of the Sandy River the different courses thereof S. 45 E 44 poles—(detailing the river calls)—in all 1918 poles to a sycamore tree, thence S 60 W 1823 poles to a hickory and white oak, thence at right angles N 30 W 1304 poles to a black oak, thence at right angles N 60 E 545 poles Phillip Lyons South West corner a white oak and with his line 1453 poles in all 1898 poles to the beginning."

As in the Danks case, the Warfield Natural Gas

Company has here produced elaborate and exhaustive technical, historical and factual evidence, as well as legendary, establishing the location of the Benjamin Say grant. Extensive and expensive surveying was done in the preparation of this case, and evidence of old citizens as to local reputation and understanding was introduced to establish the location to be on Tug River at this point. On the other side, the appellees rely in a large measure upon the description contained in the patent which calls for "the North branch of Sandy River," it being shown that the claimed location is on the east branch of Sandy River. It is claimed also that at the time this patent was issued this stream was known as the East Fork and also as Tug River. It is so referred to in patents by Kentucky in 1796. See, also, Kerr's History of Kentucky, Vol. 1, p. 980, as to the origin of the name, "Tug River." The explanation in rebuttal is that the stream in its relation to the other fork of Big Sandy River (now called the Levisa Fork) may be regarded generally as north; that the stream is referred to in the report of the commissioners establishing the boundary between Virginia and Kentucky as the "north-eastwardly branch" (Sec. 187, Ky. Stats.), and many old patents whose location is not disputed refer to it as the north fork of Sandy River. It is also shown that the lines of the survey not only fit in with adjacent surveys and patents but when a plat is super-imposed upon a present map they conform pretty well with the contours of Tug River and creeks emptying therein. According to L. E. Wallace, County Surveyor of Lawrence County, who perhaps has had greater experience than any other engineer in dealing with the lands in the territory, all Virginia grants from Louisa up Tug River (the present name of the north or east branch) of the Big Sandy River (formerly Sandy River) make a connected block, one calling for another, and that the Benjamin Say grant would not fit elsewhere. It is also observed that the small official sketch in the survey corresponds in a general way with present plats.

The calls of the patent carry a portion of it across the river over into West Virginia. However, this may be harmonized by taking 50 rods from one call and adding 50 rods to another. When that is done no part of the survey extends beyond the river but the line goes substantially to the river, making due allowances for

variations and changes in the course of the river during the ensuing one hundred and fifty years. Appellees' engineers concede that this is not an improper practice.

Some of appellants' engineers found indications of a marked boundary, while appellees' engineers deny their existence. In the light of all the other evidence and the nature of the testimony itself, this may be placed on each side in weighing the evidence as a whole.

Our conclusion on this point is that, though the evidence presented by appellees show circumstances casting some doubt on the location, the Benjamin Say patent has been properly located by the appellants.

2. The appellees challenge the continuity of Warfield's chain of title from the patent and proved or endeavored to prove several broken links. For the decision we may concede that the intervening transactions effected a hiatus, yet upon our view of the case as hereinafter expressed such condition is immaterial. It is certain that there is a connected title for many years before the present litigation.

3. Fundamental of a disposition of many questions is the meaning and effect of Section 251 of the Constitution of Kentucky. It is as follows:

"No action shall be maintained for possession of any lands lying within this state, where it is necessary for the claimant to rely for his recovery on any grant or patent issued by the Commonwealth of Virginia, or by the Commonwealth of Kentucky prior to the year one thousand eight hundred and twenty, against any person claiming such lands by possession to a well-defined boundary, under a title of record, unless such action shall be instituted within five years after this Constitution shall go into effect, or within five years after the occupant may take possession; but nothing herein shall be construed to affect any right, title or interest in lands acquired by virtue of adverse possession under the laws of this Commonwealth."

In Golden v. Blakeman, 223 Ky. 517, 3 S. W. (2d) 1095, 1096, the term "title of record" in the section was construed as meaning a valid title of record. Accordingly, under the statute declaring that a patent for land embracing land previously patented is void (Section

4704, Kentucky Statutes), it was held that a party tracing his title to a junior patent issued by Kentucky in 1846 could not in defense rely upon the limitations established by Section 251 of the Constitution in an action brought to quiet title devolving from a patent issued by Virginia in 1787 to a body of land which embraced his, the defendant's, tract. The situation presented here is the same.

Upon re-examination, we have reached the conclusion that the interpretation of Section 251 of the Constitution, declared in Golden v. Blakeman, supra, defeats the intention of the framers of that instrument and has the effect of nullifying both the letter and the purpose of the provision. If a party holding under a junior patent is precluded from the benefit of the provision because his adversary is able to produce a senior patent from Virginia, and thereby show the party's title to be void because of the statute, the provision is a dead letter, for if he could prove he has a clear and valid title under the law there would be no need for the provision. Cf. Skyles' Heirs v. King's Heirs, 9 Ky. 385, 2 A. K. Marsh, 385.

It is familiar and authoritative practice to look to the history of the times and the state of existing things in order to ascertain the meaning and purpose of a provision in the Constitution. The safest rule in the interpretation of such an instrument is to look with all the lights and aids of contemporary history at the nature and objects to be accomplished and to give to each word such force consistent with its legitimate meaning as may fairly secure and attain the ends proposed. Higgins v. Prater, Sheriff, 91 Ky. 6, 7, 14 S. W. 910, 12 Ky. Law Rep. 645. This is especially applicable to a remedial provision. We, therefore, look at the historical setting in 1891 when this section, so purely legislative in character, was peculiarly placed in the organic law of the state.

In order to secure settlement and in part to compensate men for military services, the Colony, and later the State of Virginia, freely granted warrants and patents to public lands in the District of Kentucky and elsewhere in her vast domain. These grants ranged from relatively small areas to 500,000 acres. The want of a system of recording those muniments of title, the looseness in location, the sparseness in habitation, and the

cheapness of the land were seed from which, after more than a century and a half, the harvest of litigation has not yet been fully gathered. The Act of Virginia providing for the erection of Kentucky into a new independent state, commonly called the Compact with Virginia, added to the confusion. That instrument contains four sections relating to lands. Section 7 provides that all private rights derived from the laws of Virginia prior to the separation shall remain valid and secure under the laws of the new state and shall be determined by the laws then existing in Virginia. Section 9 provides that no grant of land or land warrant issued by Kentucky "shall interfere with any warrant heretofore issued from the land office of Virginia, which shall be located on land within the said district, now liable thereto, on or before the first day of September, one thousand seven hundred and ninety-one." The Compact was accepted by a convention called for the purpose on July 20, 1790. Admission into the Union was by an Act of Congress, dated February 4, 1791, 1 Stat. 189, and consummation was had as of June 1, 1792. The Compact was expressly made a part of the several Constitutions of Kentucky except the current one. But in it and all the others it is stipulated that Virginia laws in force on June 1, 1792, which are of a general nature and not repugnant to the Constitution nor the Statutes of Kentucky, shall be in force in this state until they shall be altered or repealed by the General Assembly. Section 233, Kentucky Constitution.

Many of the Virginia patentees were killed by Indians or died from the intense exposure of the early days. Others abandoned their new possessions as worthless. Much of the property, even where claimed and identified, was never reduced to actual possession nor listed for taxation. Vacant lands were plentiful. In 1793 Kentucky established a land office and provided for the sale and granting of her vacant territory. At once a steady flow of patents began to issue in the name of the Commonwealth for what was supposed to be vacant and unappropriated land for a price—small, it is true, but a consideration nevertheless—regardless of what had been previously done by Virginia in patenting the same land. This was due in a large part to the lack of knowledge of our early settlers as to what had been done towards disposing of those lands. And there

was a dispute of long standing as to which fork of "Great Sandy" River was the boundary. See Sections 186m, 187 Kentucky Statutes. Salmons v. Webb, 51 Ky. 365. Considering the situation, it is not to be wondered that eventually overlapping and duplication occurred. Because of the generally wild nature of the territory covered by most of these Virginia grants in Eastern Kentucky, few of them were ever settled upon in those early days. But as the population increased, the land was acquired by purchase upon the assumption of good title emanating from Kentucky. Those pioneers confidently erected their homes—rough hewn and humble though they were—and developed the lands. As eloquently described by Chief Justice O'Rear, in 1907, in Eastern Kentucky Coal Lands Corporation v. Commonwealth, 127 Ky. 667, 106 S. W. 260, 267, 108 S. W. 1138, 32 Ky. Law Rep. 129, 33 Ky. Law Rep. 49:

"So far as the new settlers knew in fact, in every probability, the lands were unappropriated. The generations of a century have thus increased, and by actual occupancy, by personal industry and thrift, and by all the means by which Americans create a commonwealth, they have fastened themselves to the soil in the belief that they have inherited it from their fathers, or purchased it honestly from their neighbors, and that it is theirs.

"Notwithstanding that millions of acres have thus been reduced to that kind of actual possession and for such a period as to ripen into a perfect title in spite of its original state, and that the population of this territory is now more than 300,000 [now 600,000], there are many hundred thousand acres of these lands unfenced, whose stores of mineral and mantles of forest have remained in their natural state until the present hour. Commercial necessity and enterprise in recent years are opening this region to the markets, and what was once of small value has become enormously important and valuable. The holders of these old grants during all these years have taken no part in the development of the section where these lands lie, nor done aught to add to the state's strength and stability in peace or in war. They have contributed nothing in clearing the lands for settlement. They have not tenanted them. They have not worked them. Every

incentive of the government (save the pittance paid into the treasury for the warrants) which entered into the grant by the state has been withheld or disappointed by the grantees and those claiming under them. The state was then and is yet concerned in the subject of actual settlement, of homesteaders tied by interest and patriotism to the state's welfare. It was from the first and is yet a proper subject of public concern that these lands be seated by settlers, to the end, at least, if no greater, that the state might derive taxes from them for its support. While the people in that section may have been unmindful of the underlying insecurity of their titles, the subject has been one of constant concern to the state."

When the Convention met to frame our present Constitution in 1891, a century of confusion in titles lay behind. The conflict had been between the Virginia grants and early Kentucky patents on one side, and later Kentucky grants on the other. The records of the courts continued to be filled with litigation. The debates on what is now Section 251 of the Constitution relate in eloquent detail those conditions and the need for a remedy by the removal of the clouds which the older grants had created. It was pointed out that previous efforts of the legislature to end not only the confusion but the frequent unjust result had proved ineffectual and unconstitutional. It is recited that the holders of the old paper claims had feared or, at least, failed during all the years to do more than hold them in terrorem over the heads of those claiming under later Kentucky warrants and patents—those who had borne the labor of making the lands habitable and the burdens of government by paying the taxes on the property. Mr. Beckner, the member of the Convention from Clark County, and Mr. Hopkins, the member from Floyd, Letcher and Knott Counties, were particularly active in the debate and in explaining the need and purpose of the proposed provision. Both were eminent lawyers, well-versed in the land laws of the state. The former suggested that he would be glad to see enacted legislation that would give forfeiture for non-payment of taxes so as to "divest all who are asserting an interest in these wild lands of every shadow of claim." He added, however, that he would not ask such a radical step, since he and

those who agreed with him were content with the proposed statute of repose, saying:

"We propose simply to shorten the limitation as to these grants, and to define clearly what character of possession is required of the defendant before he can plead the lapse of time as a bar. It must be adverse, and to a well-defined boundary, under a title of record. He must have a deed or patent of record which describes the lines so clearly that they may be called 'well-defined.' To hold in this way will be good against claimants under a grant or patent issued prior to 1820 when five years shall have elapsed after the adoption of this Constitution, or the defendant shall have occupied the land for that length of time. We have, out of abundant caution, added a clause to protect all whose rights have accrued under the present laws with reference to adverse holding, although it is hardly necessary."

The question of conflict with the Compact of Virginia was given consideration by the Convention. The opinion of the Supreme Court, in Hawkins v. Barney's Lessees, 5 Pet. 457, 8 L. Ed. 190, construing the instrument was quoted from as holding that the adoption of the proposed provision would be competent. Thus the situation to be remedied and the object to be accomplished were definitely and emphatically expressed. The statute (now Section 4704) declaring junior patents void had been on the books since 1835. It was recognized by Mr. Hopkins, who pointed out that a person in possession under a junior patent could not rely upon his patent for a defense against a senior patent but must rely on his possession. Said he:

"Under this rule our Kentucky patents will avail us nothing as against the valid grants of Virginia, and we are driven to rely upon our possession for title, which would be restricted to our actual occupancy, and this would not cover more than two-thirds of the land in the mountain district, although the State has sold and conveyed to us the entirety. In order to make perfect this contract of sale, we ask you to enlarge the meaning of possession, so that it will not only avail us as a defense to the extent of actual occupancy, but that the occupancy of a part shall operate to extend the possession to a

"well-defined boundary of the whole, under a title of record, as against this particular class of claimants."

Occupancy was what should prevail; but occupancy by reason of some title of record emanating from the Commonwealth of Kentucky after 1820. Such was the meaning ascribed to the term in Shaw v. Robinson, 111 Ky. 715, 64 S. W. 620, 23 Ky. Law Rep. 998. The Constitution granted a period of five years in which those holding under the Virginia grants could quiet their titles without right on the part of those holding possession under prescription to invoke the remedy provided. Thereafter five years' occupancy under a conflicting, and perhaps junior, title of record gave the holder the right to plead the limitation provision. We think, therefore, the meaning of Section 251 of the Constitution is that where a claimant relies upon a paper title, traceable to a patent issued by Virginia or by Kentucky before 1820, his adversary may plead the five-year limitation period in bar of a right to recover under that title if he shows (a) that the land was in his possession, or his predecessor's possession, under a recorded title founded on a later grant from Kentucky when the Constitution became effective, or (b) that he has been an occupant for five years before the commencement of the action against him. Burt & Brabb Lumber Co. v. Sackett, 147 Ky. 232, 144 S. W. 34; Tennis Coal Co. v. Sackett, 172 Ky. 729, 190 S. W. 130; New York-Ky. Oil & Gas Co. v. Miller, 187 Ky. 742, 220 S. W. 535; Gillis v. Curd, 117 F. (2d) 705. The decision in Shaw v. Robinson, 111 Ky. 715, 716, 64 S. W. 620, 23 Ky. Law Rep. 998, that "title of record" means a title emanating from the Commonwealth of Kentucky, is adhered to. See, also, Skyles' Heirs v. King's Heirs, 9 Ky. 385, 2 A. K. Marsh. 385; Steele v. Jackson, 140 Ky. 821, 131 S. W. 1032. But the court is now of opinion that is not necessarily a title dependent for its validity upon seniority of origin as between a Virginia grant or Kentucky patent antedating 1820 on the one side and a later Kentucky patent on the other, as was held in Golden v. Blakeman, supra. We conclude it was error for the court to interpolate the word "valid" and then apply the terms of Section 4704 of the Statutes. To the extent that the opinion is in conflict with the conclusion herein expressed, it is overruled. Likewise the cases which have

followed it, Flinn v. Blakeman, 254 Ky. 416, 71 S. W. (2d) 961; Warfield Natural Gas Company v. Danks, 271 Ky. 452, 112 S. W. (2d) 674.

To avoid possible misinterpretation we are not to be understood as saying that a record title which is valid otherwise is affected by this ruling. It is only where superiority of title is based upon a patent issued by Virginia or by Kentucky before 1820 that the constitutional plea of limitations can be invoked. Furthermore, the "title of record" referred to cannot be relied on as a sword for attack nor as a shield in defense except to support possession and to describe its extent. The effect of this interpretation is that the advantage is lost to a party by reason of a better record title when this limitation provision of the Constitution is invoked and the facts required for its application established. The contest then is confined to issues of adverse possession.

Of course, the courts have nothing to do with the policy of this constitutional provision even though it were thought to be severe. But it is of interest to observe that the drastic compulsion upon those holding under the old patents suggested by Mr. Hopkins in the debates was enacted into law by the General Assembly in 1906 (Section 4076b et seq., Kentucky Statutes). The act inaugurated a system for forfeiting land for nonpayment of taxes and transferring title to others who were occupying and had been paying taxes on the land. The effect was to outlaw titles claimed under Virginia grants for the benefit of occupying claimants. The validity of the act, though vigorously assailed as violating the Compact of Virginia, and otherwise, was declared in several cases reported under the style of Eastern Kentucky Coal Lands Corporation v. Commonwealth, 127 Ky. 667, 106 S. W. 260, 108 S. W. 1138, 32 Ky. Law Rep. 129, 33 Ky. Law Rep. 49, and affirmed under the style of Kentucky Union Company v. Kentucky, 219 U. S. 140, 31 S. Ct. 171, 55 L. Ed. 137. If the Compact with Virginia be regarded as superior to the Constitution of this state in this relation, or a restriction on the power of Kentucky as an independent sovereign in the respects covered by it, nevertheless we are of opinion that it was competent for Kentucky to provide that timely action should be taken to preserve the rights reserved or given by that instrument. The

conclusion is supported by the reasoning of Eastern Kentucky Coal Lands Corporation v. Commonwealth, supra; Kentucky Union Company v. Kentucky, supra; and Hawkins v. Barney's Lessees, supra. Moreover, it is to be borne in mind that the provision deals with the matter of remedy and not of right, and that statutes of limitation operating prospectively do not impair or extinguish vested rights. 17 R. C. L. 666, 682; Christmas v. Russell, 5 Wal. 290, 18 L. Ed. 475.

4. Disposition of the foregoing issues seems to take out of the case a number of other questions quite intricate. It is admitted that the land in controversy is within the Say and Fuller patents as located, there being no issue as to the Fuller grant. It is clear that the Wards had been in possession of the land claimed for five years under a title of record, and, therefore, under our interpretation of Section 251 of the Constitution, they may invoke the limitations therein established.

Appellants further contend (a) that part of the Ward lands are embraced in senior Kentucky patents, under which, however, appellants do not claim; and (b) that the Ward's predecessor, George Chapman, was divested of title to a part of the land by a sale under execution on July 9, 1883, to J. L. Peters; but appellants do not claim under Peters. The point is that because of these conditions Ward's Heirs did not meet the burden of establishing good title. Upon the hypothesis of a superior title of record in the Warfield Company, based upon the Virginia grants, but unenforceable becuase of the plea of limitations, Ward's Heirs cannot rely upon their record title; hence it becomes immaterial whether or not their title is defective by reason of either or both of these claimed defects. It does not appear that the portions of the land covered by these conditions did not remain in the possession of their predecessors.

So far as the main body of the case is concerned, it is resolved into a question of adverse possession, with the burden resting upon Ward's Heirs, as plaintiffs, to establish the title by prescription. Their muniments of title, though invalid, constituted color of title and defined the extent of their possession even though they exercised ownership only over portions thereof. Combs

v. Ezell, 232 Ky. 602, 24 S. W. (2d) 301; Turner v. Turner, 237 Ky. 257, 35 S. W. (2d) 289.

5. As we have stated, Ward's Heirs go back to George Chapman for their title of record. He had acquired patents himself for 350 acres in 1858 and of 60 acres in 1880, and had acquired title to the remainder of 250 acres from John Chapman, his father, and John Hobbs, who had obtained patents in 1855 and 1862. There is evidence that about the time George Chapman married he built a house on this land and moved there sometime before the Civil War. His son John, who at the time he testified was 65 or 66 years old, was born on the place and lived there until he was 30 years old. His father had cultivated the land, sold the timber and exercised general control and ownership all the time over all of it. He had moved off when the witness was about 30 years old because W. J. Ward, Sr., acquired title and possession through the foreclosure of a mortgage. There is other evidence to the same effect. Most of the interrogation of the witnesses related to the extent of clearance and other acts sufficient to establish adverse possession. It is certain that in the beginning, perhaps about 1860, Chapman actually occupied only a small part of the land. Indeed, he never claimed or had paper title to 60 acres of it until 1880, when he secured a patent from the state. But it is equally certain that long before fifteen years prior to the institution of this suit his successors had extended their actual occupancy to most of the defined area, if not all of it.

It may be added that when disputes would arise over timber and boundaries from time to time, Chapman would have the lines run and marked. At one time there were seven small houses and a large one on the property. The evidence of actual use and possession is established by a number of elderly witnesses, several of whom were intimately related to Chapman, and all familiar with the occupancy and use of the land down to the present time.

The possession by the Warfield Company and its predecessors, as outlined in brief for appellants, may be thus more briefly described: In 1855, Colonel George R. C. Floyd had acquired, by various conveyances, the land embraced by the Benjamin Say patent and had established the town of Warfield within its confines. He made clear to everyone that his intention was to claim

and possess to the utmost limits of the grant. He established salt works, a saw-mill, coal mine and general store. Considerable farming was done through tenants. It appears that just before the Civil War Colonel Floyd left the property with an agent. In 1867, the Warfield Coal & Salt Company purchased the lands covered by the Say patent and placed agents in charge. As we understand, the same method of holding and possessing the lands continued through successive companies until Louis Burger individually became the owner, followed by appellants. Tax rolls of eighty years and more ago disclose what was apparently the Say 15,000 acres listed for taxation at $3 an acre. Appellants maintain their proof shows a regular listing of the property since then, excepting, of course, portions sold from time to time. This is challenged by appellees. But the payment of taxes is but an element of adverse possession and does not alone constitute actual possession. Kypadel Coal & Lumber Company v. Millard, 165 Ky. 432, 177 S. W. 270; Griffith Lumber Company v. Kirk, 228 Ky. 310, 14 S. W. (2d) 1075.

The town of Warfield, around which the activities were carried on, lies at or near the mouth of Buck Creek, while the land claimed by Ward's Heirs is some distance north of the headwaters of the Right and Left Forks of Little Elk Creek. The appellants do not point out any evidence contained in this vast record showing that there was ever any active or actual possession of this particular section. Moreover, there is considerable evidence to show that there was no such possession beyond that which lay along the river and up the Buck Creek water-shed and south of it. Colonel Floyd himself, testifying in an old suit, referred only to the Buck Creek and Collins Creek water-sheds as that to which he had actual and undisputed possession from 1857 to 1865.

Though there may have been an intention on the part of appellants' predecessors and themselves to hold and possess the entire 15,000 acres, or such parts as were not sold off from time to time, in the light of this evidence it cannot be said as a matter of fact and of law that they possessed or occupied adversely the entire body, for as is well-known conduct or the active exercise of ownership is as essential an element of adverse possession as intention. There must be both intention and action existing and appearing on the land itself.

Bowman v. Bartlet, 10 Ky. 86, 3 A. K. Marsh. 86; New Domain Oil & Gas Company v. Gaffney Oil Company, 134 Ky. 792, 121 S. W. 699; Culton v. Simpson, 265 Ky. 343, 96 S. W. (2d) 856.

Indeed, appellants claim as to their own adverse possession of the land involved rests upon the rule that possession under a patent or later conveyance even though invalid is possession by construction to the extent of the boundary called for by the color of title. Tennis Coal Company v. Sackett, 172 Ky. 729, 190 S. W. 130, Ann. Cas. 1917E, 629; Kentucky Union Company v. Gilliam, 235 Ky. 316, 31 S. W. (2d) 388; Culton v. Simpson, 265 Ky. 343, 96 S. W. (2d) 856; Combs v. Ezell, 232 Ky. 602, 24 S. W. (2d) 301; Stephenson Lumber Company v. Hurst, 259 Ky. 747, 83 S. W. (2d) 48. They would deprive the appellees of the benefit of the same rule by saying that the proof shows their physical possession was on the portion known as the "John Chapman patent" and that their constructive possession is confined to the boundary of that particular patent. See Sexton v. Ely, 161 Ky. 259, 170 S. W. 629; Elliott v. Hensley, 188 Ky. 444, 222 S. W. 507. We do not think the evidence justifies the conclusion of such limited actual occupation. The five patents join and Ward acquired the body of land as a unit in 1891 and since held and used it as such. Before that, we think the evidence shows there was sufficient actual occupancy on portions of each patent to constitute adverse possession to the described boundary of each of them.

Further argument is that if appellees should be given the benefit of the rule of constructive possession co-extensive with the boundary of the entire 660 acres, then they, appellants, must prevail for as between conflicting constructive possession the law puts the title in them because of their better and superior title of record, it being elder or prior. Miniard v. Napier, 167 Ky. 208, 180 S. W. 363; Stephenson Lumber Company v. Hurst, supra; Turk v. Wilson's Heirs, 266 Ky. 78, 98 S. W. (2d) 4.

Putting aside that and several other predicates and arguments, so far as the surface claims go, we conclude the appellees, Ward's Heirs, established good title by adverse possession. As to the mineral claims involved, it seems to us there is an insurmountable barrier that

estops the appellants from denying the extent of the possession of the plaintiffs, namely, the recognition not only of the claims of the Ward Heirs to title, but title to the entire body of the land.

On July 20, 1899, W. J. Ward, Sr., had a record title and held the adverse possession of the land—in whole, as his heirs contend, or in part, as appellants admit. On that day he executed an oil and gas lease to the Triple State Natural Gas & Oil Company and its assigns. The description is that the land is bounded on the north by the lands of J. R. Ward, on the east by the lands of Charlotte Henry, and on the south and west by the lands of the Tug River Coal & Salt Company, and as "containing 500 acres more or less." Though it appears that the quantity of 500 acres was inaccurate (the area of 660 acres, however, being the aggregate of the old patents, and is itself inaccurate), the described boundary and the evidence show that the lease embraced the entire tract now claimed by Ward's Heirs. The Tug River Coal & Salt Company was a predecessor in title to the property now owned by the Warfield Company. The lease to the Triple State Company was also acquired by the Warfield Company. It ran for 30 years. For 26 years the lessee and its assigns regularly paid the annual delay rentals to Ward, Sr., and later to his administrator. In 1925 Ward's Heirs rejected the annual rental and demanded development of the lease. The result was that on November 2, 1925, the Warfield Company wrote that its investigation had developed that Ward's Heirs had no title to the minerals in the land and for that reason the company no longer claimed any interest under the lease. It was further said:

"If we do any drilling thereon it will be under leases we have from other parties."

However, nearly five years later the company wrote and claimed the lease "did not expire by limitation for the reason that on June 21, 1929, this company completed its well, No. 3939, under the terms of said contract."

On April 5, 1899, three months before the lease was executed by W. J. Ward, Sr., Louis Burger (through whom the Warfield Company claims title to both the surface and minerals) executed an oil and gas lease to the same company, namely, the **Triple State Natural**

Gas & Oil Company, of what is called therein the "Warfield property," said to contain 15,000 acres. The lease anticipated a definite ascertainment of the acreage upon which rentals should be paid and provided that adjustment would be made in the rentals by the deduction of land which Burger "does not legally own," the 15,000 acres being recited "as the basis" to start with. This lease was for 20 years and by its terms expired April 5, 1919. Nevertheless, the appellants pleaded in this case that it was under this lease that development began on the Ward property and they also relied upon adverse possession under and by reason of this lease.

The claim of adverse possession under the Burger lease is untenable for the reason that the acceptance of the second lease on the same property from Ward, Sr., was an abandonment of all rights acquired under the lease taken three months earlier from Burger if it be regarded that it covered the Ward land. Willis' Thornton on Oil & Gas, Section 143; Garrett v. South Penn Oil Company, 66 W. Va. 587, 66 S. E. 741; Martel v. Jennings-Heywood Oil Syndicate, 114 La. 351, 38 So. 253; Cf. Papoose Oil Company v. Swindler, 95 Okl. 264, 221 P. 506. The second lease taken from Ward was doubtless because it was believed that his land was not within Burger's 15,000 acres. As we have stated, the terms of Burger's lease recognized that there was some land within that large acreage to be deducted because Burger did "not legally own" it. More than that, the acceptance of the lease from Ward recognized his claims to the entire boundary. That recognition broke the continuity of any adverse possession by construction or otherwise that Warfield and its predecessors had to it. The appellants' predecessor and they themselves recognized Ward as the true owner thereby precluding hostility of possession thereafter. Cooper v. Cooper, 212 Ky. 454, 279 S. W. 615; Woods v. Garrard, 282 Ky. 233, 138 S. W. (2d) 325; Houston Oil Company v. Pullen, Tex. Com. App., 272 S. W. 439; Geries v. Magness, Tex. Civ. App., 31 S. W. (2d) 167; Northern Pacific Railroad Company v. Cash, 67 Mont. 585, 216 P. 782; 2 C. J. S., Adverse Possession, sec. 81, p. 626. After the Ward lease, the parties, as lessor and lessee, were in joint or common, possession. Willis' Thornton on Oil & Gas, Sections 464, 465; Cf. Burns v. Dillon, 226 Ky. 82, 9 S. W. (2d) 1095. The Warfield Company's possession

being in subservience to and in recognition of Ward's title and claims could never ripen into title. Childers v. Kennedy, 189 Ky. 179, 224 S. W. 651. This recognition continued down to the filing of the defendants' answer in this lawsuit excepting an interval between its disavowance of the validity of Ward's lease and a renunciation of that disavowal and reversion to the original claim of validity and ownership some six weeks before the suit was filed.

The appellants argue that merely taking a second lease from a party claiming ownership of the land and paying delay rentals to him does not estop the lessee from denying the title of the second lessor where he has not drilled any wells on the property under or by virtue of the second lease. They rely upon Stowers v. Huntington Development & Gas Company, 4 Cir., 72 F. (2d) 696, 98 A. L. R. 536. We may agree to the proposition of law that merely taking a second lease in order to protect himself is not in and of itself sufficient to constitute an estoppel. But we do not think it must have been necessary in every case that there was development under the second lease. Other facts and circumstances may be enough. In this case the lessee for a long period of years paid delay rentals to the second lessor, refused to develop the property, then abandoned all interest under the lease but eventually claimed title under it and drilled a well on the property under such claim. We think these facts are sufficient to work an estoppel to deny the second lessor's title.

Our conclusion, therefore, is that Ward's Heirs established title by prescription to the lands claimed.

6. Thus far we have treated the entire area of 660 acres as a unit and have grouped the parties on either side as having identical title or joint ownership. It seemed better to do so in the interest of clarity, precision yielding to convenience. However, the appellants' rights are not altogether lodged in the Warfield Company, although the appellants are allies and harmony exists among them as they have fought the common enemy. Further, the subject matter is not unified as we have treated it. These exceptions or qualifications may now be presented and disposed of.

Within the area of 660 acres is a tract of 100 acres called the "Parsley Tract," the oil and gas thereunder

all being adjudged to belong to Lewis Dempsey, subject to whatever right, title or interest his co-defendants may own therein. It was also adjudged that Dempsey owned and should recover an undivided 2/8 interest in and to the oil and gas in the remainder of the land described as containing 550 acres, subject to his co-defendants' rights. It was further adjudged that W. J. Ward, Jr., was the owner of the surface of a certain 100 acres. The oil and gas lease executed on July 20, 1899, by W. J. Ward, Sr., to the Triple State Natural Gas & Oil Company and all its transfers and assignments were cancelled and set aside.

The cross appeal by Ward's Heirs is from that part of the judgment in favor of Dempsey.

7. Lewis Dempsey claimed to be the owner of all the surface and an undivided one-half interest in the minerals in the entire body of 660 acres through succession from the Benjamin Say patent. The manner of his acquisition of claimed ownership through this source, involving some compromises with Burger and perhaps other conflicting claimants, is not here material, for that succession of title has been disposed of adversely. In addition Dempsey claimed a fee-simple title to the Parsley Tract from the same source that appellees claim title, namely, through George Chapman. Though the court adjudged him the minerals, he does not now register any complaint over having received only a part of what he claimed.

As we have stated, appellees' title goes back to their ancestor, W. J. Ward, Sr. On September 24, 1883, George Chapman mortgaged all of his land to Ward. The mortgage was foreclosed and the master commissioner deeded him the land on November 25, 1891. Prior to the mortgage to Ward, Chapman had executed a mortgage on 100 acres, including his home, to Jessie Parsley, to secure a debt of $190. It was dated September 19, 1881. This mortgage was foreclosed and Parsley bought the land for $97.14. He obtained a commissioner's deed on November 24, 1886; hence, Ward's title to this 100 acres was inferior to Parsley's. Parsley deeded the tract to Carpenter on March 26, 1889, and he conveyed it to Dempsey on February 8, 1921, so that when Ward obtained his deed to the entire body of land Dempsey's predecessor had a deed to 100 acres of it. The attack upon Dempsey's title is along three lines,

namely: (a) the Parsley mortgage and subsequent judgment are void; (b) adverse possession and champerty; and (c) estoppel because of his repudiation and abandonment by reason of his consistent and persistent adverse claims under his Burger deed, i. e., through the Say patent.

(a) It is argued that the evidence and the law require that Chapman's mortgage to Parsley be declared void because it was of a homestead and Chapman's wife did not join therein and the value of the entire property at that time was less than $1,000. Section 1706, Kentucky Statutes; Damron v. Pikeville Grocery Company, 222 Ky. 749, 2 S. W. (2d) 366. Appellees also claim that the mortgage was paid. It is submitted that the judgment is void because it was rendered on a void instrument and its invalidity destroys all subsequent transactions based upon it. Denying all this, Dempsey pleaded res adjudicata. He pleaded in bar a judgment rendered in the Martin Circuit Court on April 12, 1921, in a suit filed by W. J. Ward, Sr., against Carpenter setting up his ownership of the property and the claims of Carpenter through and by virtue of the judgment in favor of Parsley, and alleging that that judgment was void upon the same grounds now assigned by his heirs. It was prayed that the mortgage, judgment and the subsequent conveyances be declared void and that the plaintiffs' title be quieted. Ward, Sr., died in January, 1904. On July 6, 1904, it was ordered that the case stand revived in the names of thirteen persons, the plaintiff's children and heirs. This suit was consolidated with a suit which Carpenter had previously brought against U. G. Parsley for trespass on the land in which Dempsey had been made a party because U. G. Parsley claimed to have bought the timber from him. The case was dormant a long time. The judgment recites that plaintiffs dismissed their petition and that Dempsey withdrew his answer to Carpenter's cross-petition. It was adjudged on Carpenter's counterclaim that he was the owner of and entitled to immediate possession of the 100-acre tract and his title was quieted.

In response to the plea in bar of this judgment, Ward's Heirs pleaded and now argue that this judgment also is void. The reasons alleged are that the plaintiff, W. J. Ward, Sr., left adult and infant heirs and that there was never any order of revivor as re-

quired by Section 500 et seq., Civil Code of Practice, and that during the pendency of the suit other parties had become owners of other portions of the land and that they had not been made parties to the suit. It was further claimed that no guardian ad litem had ever been appointed for the infant heirs. As to the appointment of a guardian ad litem the clerk could find no order appointing one. Many of the parties whose names are stated in the order of revivor testified that no one was authorized to represent them; that they received no notice of the revivor and were never summoned in the case or heard of it until recently. They point out several suspicious conditions connected with this old record as showing that the judgment was fraudulently obtained. Excepting the petition, all the papers in that old case have been lost. The orders are meager. Ward's Heirs insist. that their extrinsic evidence is not only competent but effective to establish the invalidity of the judgment and sufficient to give them a day in court to establish the fact that the mortgage from W. J. Ward, Sr., to Jessie Parsley and all subsequent transactions thereon are void.

Passing over the apparent demerits of the claim that Parsley's mortgage was invalid (for Mrs. Chapman's homestead has long since passed from this world to another), and that the foreclosure judgment was void, we are of opinion the plea of res adjudicata was properly sustained. It is a well-established rule that in a collateral attack on a judgment the absence of jurisdiction must affirmatively appear of record and can not be established by extrinsic evidence. The matter of summons or appearance in the case is particularly of that class. Bamberger v. Green, 146 Ky. 258, 142 S. W. 384; Crider v. Sutherland, 186 Ky. 7, 216 S. W. 57; Dean v. Brown, 261 Ky. 593, 88 S. W. (2d) 298. We held in Wolverton v. Baynham, 226 Ky. 214, 10 S. W. (2d) 837, that the misplacement of the papers in the case cannot affect the integrity of the judgment and other entries in the permanent records of the court, for as the papers had become only evidential and historical it will be presumed they support the record. The judgment being valid, it was unquestionably a bar to this proceeding by Ward's Heirs to get away from Dempsey's title of record. Perry v. Eagle Coal Company, 170 Ky. 824, 186 S. W. 875.

(b) There are also several insurmountable barriers to the success of the cross-appellants' claim of adverse possession to the minerals under the Parsley Tract. One is that the period of limitations through which title might have been ripening was suspended during the seventeen years the suit to quiet title was pending, and by that judgment the claim was effectually cleared. Perry v. Eagle Coal Company, supra; Lashley v. Duvall, 226 Ky. 685, 11 S. W. (2d) 708. The subsequent period was not long enough, and in any event the possession by Ward's Heirs thereafter was in subordination to the title therein adjudged. Green v. Strubbe, 234 Ky. 380, 28 S. W. (2d) 469. Another barrier is the existence of the oil and gas lease of the Triple State Natural Gas & Oil Company and its assignees from which Ward's Heirs received annual delay rentals during the entire time. As we understand it, both parties believed and regarded this lease as including the Parsley Tract. If Ward's Heirs were holding the surface adversely they could not have been holding the minerals for they were affirming the existence of title to the oil and gas in someone else. If that lease did not or was not believed to embrace the Parsley Tract, it is certain that Dempsey owned a 2/8 undivided interest in the oil and gas, as we shall presently state, and there could have been no adverse possession except by notice or certain notorious action which was not given or done here. Ky. Statutes, Sec. 2366a-1; Willis' Thornton on Oil & Gas, Section 466; Hoskins v. Northern Lee Oil & Gas Company, 194 Ky. 628, 240 S. W. 377; McPherson v. Thompson, 203 Ky. 35, 261 S. W. 853; Piney Oil & Gas Company v. Scott, 258 Ky. 51, 79 S. W. (2d) 394.

(c) This avenue of escape, namely, the estoppel of Dempsey to claim under his Parsley title because of his insistence upon title through the other source is disposed of in considering the next proposition.

8. In September, 1903, W. J. Ward, Sr., executed a deed to his son, W. J. Ward, Jr., of his entire body of land. He at once conveyed a half interest to W. G. Waller. A few weeks later they sold the tract to S. W. Ward, another son. Within a year he re-conveyed it to Waller, excepting two tracts aggregating 250 acres. Waller deeded it to Fairchilds and Cain by a general and loose description and apparently did not exclude the 250 acres excepted from his deed. Fairchilds and

Cain deeded the land to Dempsey on November 18, 1905, with a covenant of special warranty. While Waller held title he filed a suit on January 9, 1905, against the heirs of W. J. Ward, Sr. (who had died in January, 1904), in which he sought to recover the oil and gas under the land because the deed from Ward, Sr., to Ward, Jr., contained no reservation of those minerals. It was proven that as written the deed had contained a reservation of oil and gas but before it was recorded someone with pen and ink had drawn a line through the clause and the deed was recorded with it eliminated. When Ward, Jr., conveyed a half interest to Waller he did not reserve the minerals nor did the deed from S. W. Waller to him do so. The circuit court reformed the deed from Ward, Sr., to Ward, Jr., and ordered it to be re-recorded with the reservation clause in it. The judgment established a 6/8 undivided interest in the minerals in six of the heirs of W. J. Ward, Sr., as not having been conveyed by him, but the 2/8 which otherwise would have been adjudged to W. J. Ward, Jr., and S. W. Ward were held to have been conveyed by them to Waller. The judgment was affirmed. Waller v. Ward, 101 S. W. 341, 31 Ky. Law Rep. 40. The apparent reason for the reservation of the minerals by Ward, Sr., was that he had previously executed an oil and gas lease to the Triple State Natural Gas & Oil Company on July 20, 1899, as is recited in that opinion and to which we have referred herein. Though it is not so provided in that judgment, it is obvious that the adjudication of the oil and gas rights in the land in favor of Waller and the six Ward Heirs was subject to that prior lease. It is by this means that Dempsey became vested with title to 2/8 of the oil and gas in the whole body of 660 acres, excepting the 100 acres of the Parsley land in which he was adjudged the owner of all the lands.

The only ground of objection raised to this part of the judgment by the cross-appellants is that Dempsey had never attempted to hold this undivided interest through the other chain, and by repudiation and election must be regarded as estopped to make this claim.

In the first place there is no evidence tending to establish the abandonment or repudiation by Dempsey unless a failure to demand 2/8 of the annual delay rentals of $50 paid to the Ward Heirs by the holder of

the Triple State Natural Gas & Oil Company lease be so regarded. Turk v. Wilson's Heirs, 266 Ky. 78, 98 S. W. (2d) 4. The purchase by Dempsey of other title was apparently to buy his peace. One having or claiming title to land by purchasing or procuring an outstanding or adverse claim or title does not admit that it is paramount to that under which he holds and does not thereby estop himself to deny its validity. Cavin v. Little, 213 Ky. 482, 281 S. W. 480. Absent from this case is the element of estoppel that the party relying upon it must have been lulled into a sense of security or have changed his position by reason of the act of the other party. The circuit court rightly adjudged Dempsey to have title to 2/8 of the minerals.

9. The judgment does not declare title to the surface of any of the land excepting a certain 100 acres adjudged to be owned by W. J. Ward, Jr. However, no complaint is raised against the judgment in either respect. Cancellation of the oil and gas lease to the Triple State Natural Gas & Oil Company, which the appellants contend remained alive, is not questioned. Nor could it be.

The judgment is affirmed both on the direct and cross-appeal.

Whole Court sitting, except Judge Rees.